F I L E D
United States Court of Appeals
Tenth Circuit

APR 14 2005

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

TEREZA GONZALES,

        Plaintiff - Appellant,

    v.

ROBERT MARTINEZ; DOMINICK
GONZALES; JOHN SALAZAR, as the
Sheriff of Huerfano County, Colorado;
HUERFANO COUNTY,
COLORADO,

        Defendants - Appellees.

No. 03-1348

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 99-S-1152-OES)

Raphael M. Solot, (Darol C. Biddle, Pueblo, Colorado with him on the briefs), Denver,
Colorado for Plaintiff - Appellant.

David R. Brougham, Hall & Evans, Denver, Colorado for Defendants - Appellees.

Before **SEYMOUR**, **PORFILIO**, and **HARTZ**, Circuit Judges.

**PORFILIO**, Senior Circuit Judge.

In ***Farmer v. Brennan***, 511 U.S. 825, 847 (1994), the Court decided "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." In this case, the district court concluded plaintiff failed to meet her burden of establishing a constitutional violation by presenting evidence jail officials knew of the substantial risk of physical harm to prisoners in their facility and failed to take reasonable measures to prevent its recurrence. Concluding the record indicates the contrary, we reverse.

## I. Background

On the afternoon of October 13, 1998, Robert Martinez (Major Bob), the administrator of the Huerfano County Jail in Walsenburg, Colorado,[1] escorted inmate Tereza Gonzales[2] to the Jail commissary after she requested a comb. Inside the small room, Major Bob used his knife to open a package of combs and then, with the knife in his hand, blade open, told Ms. Gonzales, "Once you're in this room, you belong to me."

---

[1]In his deposition, Sheriff Salazar stated the jail administrator is in charge of overseeing and monitoring all operations at the Jail, including the control room, booking, security, meals, medical needs, and employee paperwork. Although Martinez held the title, "Major," and was called Major Bob in the Jail, Sheriff Salazar indicated Martinez asked for the title. As jail administrator, Major Bob reported directly to Sheriff Salazar, whose wife is Martinez's niece.

[2]Ms. Gonzales had then served about a week of a 30-day sentence imposed for her failure to appear in court on a pending charge. Except for when she was sent to Fort Logan, Colorado, after her father killed her mother, she had never been incarcerated before.

Major Bob sexually assaulted her. On the same afternoon, Amanda Guel,[3] another inmate, was summoned to the control room by Dominick Gonzales,[4] the senior detention officer, who sexually assaulted her.

That evening, both women handed written statements describing the assaults to two detention officers who called Huerfano County Sheriff John Salazar. Sheriff Salazar then went to the jail and instructed the officers on duty to tell Ms. Guel and Ms. Gonzales he had been notified and would speak to them the next morning.

Instead, Sheriff Salazar transported Ms. Gonzales to another of her court appearances and learned she had written a second report on the sexual assault, which she did not give him. Sheriff Salazar told her to give the statement to her public defender.

Shortly after her return to the women's pod at the Jail, however, Major Bob, speaking over the intercom, summoned Ms. Gonzales to the control room.[5] There, Major Bob grabbed her arm and stated, "Let's start off where we left off yesterday." Ms. Gonzales told Major Bob "it was bad," but he "pressed his body" against hers and

---

[3]Ms. Guel filed similar claims against the same parties. After settlement, the district court dismissed her case.

[4]Tereza Gonzales and Dominick Gonzales are not related. However, Dominick Gonzales is Sheriff Salazar's son-in-law. To avoid confusion, Dominick Gonzales will be referred to as "Dominick."

[5]At that time, the control room, the command center for Jail security, housed video cameras to monitor some areas of the Jail.

tried to kiss her, before she "pushed [him] away and went back to the pod." During the encounter, she stated he did not "have anything unzipped."

Although he did not speak with Ms. Gonzales until after the second encounter with Major Bob and another of her court appearances on October 14th, Sheriff Salazar did interview Ms. Guel around 1:00 p.m. that day. Later, he met with Ms. Gonzales and her public defender, who, along with a Deputy District Attorney, instructed her to remain silent.

Soon after, the District Attorney called Sheriff Salazar and told him to release Ms. Guel and Ms. Gonzales immediately. That same afternoon, one of the District Attorney's investigators arrived at the Jail. Following her investigation, Major Bob and Dominick were suspended and later charged with and convicted of the assaults.

Ms. Gonzales filed this action under 42 U.S.C. § 1983, alleging "there were other incidents of sexual assault at the Huerfano County Jail involving Martinez, Gonzales and/or others of which Salazar and Martinez were aware, and that Salazar and Martinez failed to take those steps necessary to assure the safety of the plaintiff." As defendants, she named Sheriff Salazar,[6] Huerfano County,[7] Martinez, and Dominick Gonzales. Ms.

---

[6]The Magistrate Judge decided Sheriff Salazar was sued in his individual and personal capacity.

[7]Curiously, neither the district court nor defendants have challenged Ms. Gonzales' designating "Huerfano County" as defendant. Under Colo. Rev. Stat. § 30-11-105, "the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of ...........'" "This statutory provision provides the exclusive
(continued...)

- 4 -

Gonzales alleged defendants knew of the danger Major Bob and Dominick posed and failed to protect her in violation of her Eighth Amendment rights.[8] Ms. Gonzales also alleged Huerfano County owed a duty to employ competent law enforcement officers and to supervise their conduct to prevent violations of prisoners' civil rights.

Sheriff Salazar and Huerfano County moved for summary judgment alleging the undisputed facts sustained no constitutional violation and the doctrine of qualified immunity barred any such claim against Sheriff Salazar. The Magistrate Judge recommended granting the motion.

---

[7](...continued) method by which jurisdiction over a county can be obtained. An action attempted to be brought under any other designation is a nullity, and no valid judgment can enter in such a case." ***Calahan v. Jefferson County***, 429 P.2d 301, 302 (Colo. 1967). Were we to overlook this jurisdictional flaw, we are still guided by ***Bristol v. Bd. of County Comm'rs of Clear Creek***, 312 F.3d 1213, 1215 (10th Cir. 2002) (under the Colorado constitution, the County Sheriff is a distinct position, separate from the Board of County Commissioners). The only claims Plaintiff made against the County were based on a faulty premise. She asserted the County owed her a duty "to employ competent law enforcement officers and to supervise the conduct of its sheriff and Chief Jail Administrator." That is not a valid premise under Colorado law. ***Id***. Had Plaintiff claimed the Sheriff set official policy of the County or was following policy established by the County in the operation of the jail, we might have to reach a different conclusion. See ***id***. at 1221 ("counties can be held liable for the misdeeds of Sheriffs and their employees when the Sheriff is held to set 'official policy' for the county."). Yet, whether because of the plain language of the statute or the Plaintiff's failure to state a valid claim, the action cannot lie against Huerfano County.

[8]Her second claim for negligent supervision against Sheriff Salazar and Huerfano County is subsumed within the first. Her third claim for assault and battery against Major Bob and Dominick, was dismissed with prejudice after the district court dismissed the § 1983 and negligent supervision claims.

In an oral order from the bench, the district court embraced the Magistrate Judge's order in its entirety, holding that while the sexual assaults were undisputed, Sheriff Salazar's failure to prevent harm to Ms. Gonzales did not amount to deliberate indifference. In response to prior incidents of sexual misconduct and violence at the Jail, the court summarily concluded without citing any specific evidence, "Sheriff Salazar took appropriate remedial measures at the time" but observed, Sheriff Salazar "was unable to do anything" after the October 13th sexual assaults because Ms. Gonzales "refused to discuss the matter with him on one occasion . . . on two occasions." Ms. Gonzales seeks de novo review of that judgment.

## II. Prior Incidents Establishing Notice

To meet the *Farmer* test that Sheriff Salazar knew of and disregarded "an excessive risk to inmate health and safety," 511 U.S. at 837, Ms. Gonzales presented a series of incidents both preceding and following her assault to establish a genuine issue of material fact that the sheriff was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [] must also draw the inference." *Id.* Under this test, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually* would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of serious harm." *Id.* at 842 (emphasis added). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual

ways, including *inference* from circumstantial evidence." *Id.* (emphasis added). To meet this test, Ms. Gonzales presented a series of incidents at the Jail, which, she contends, cumulatively establishes Sheriff Salazar failed to protect her "despite his knowledge of a substantial risk of harm." *Id.*

First, Ms. Gonzales presented evidence, including Sheriff Salazar's testimony, he had not conducted any employee performance evaluations since 1994, only occasionally visited the jail, and left the investigation of all problems at the jail to his designee, Sergeant Paul Zudar. Second, given this supervisory style, Ms. Gonzales set out a series of specific incidents which occurred from August 1997 to October 1997.

Explaining his response to those events, Sheriff Salazar stated although Major Bob, the Jail Administrator, "was concerned about the allegations, [] he didn't want to take the step forward to investigate, so I assigned a Sergeant Mike[9] Zudar." In one incident on August 7, 1997, inmate Brent Maldonado alleged he was beaten up in C-pod by fellow inmates who were drinking vodka; Dominick was in the control room and failed to respond to his screams.[10] On August 10, 1997, Detention Officer Ruiz filed an incident report stating he saw inmates from C-pod sitting in the control room. He noted

---

[9]Sheriff Salazar stated "Mike" although the record consistently refers to Sgt. Paul Zudar.

[10]Mr. Maldonado also reported he was beaten again on October 31, 1997, without any intervention by guards. In his deposition, Sheriff Salazar did not remember whether the investigation of these complaints established any fault on Dominick's part but believed Dominick was not disciplined. Mr. Maldonado's attorney apparently did not pursue an initial intent to sue notice.

some inmates had bloodshot eyes and appeared to know how to run the controls and "bragged about knowing how to run the controls." The inmates remained in the control room for several hours before returning to their pod. He stated, "I overlooked the situation because I was new to the job and did not know what to do."

On October 14, 1997, Sergeant Montoya, a female deputy, received a report that Dominick entered the women's pod and exposed himself to inmates. Documenting their complaints about the event, inmates Rebecca Flecksteiner[11] and Josette Montez separately wrote statements describing a setting of lax security in which Dominick would call female inmates to the meds room and taunt them over the intercom operated in the control room to "show us your tits." Under his control, Ms. Flecksteiner complained Dominick rewarded female inmates for participating or punished them for objecting.[12] Asked about these reports, Sheriff Salazar stated he did not believe them: "[t]he majority of the inmates that we have in our facility would conjure up and work with other inmates to disbelieve – or discredit one officer, because they are strict on rules." When the matter was referred for investigation, Sergeant Zudar testified he directly questioned Dominick about the report and credited his direct eye contact and calm over the inmates' reports. No discipline followed.

_____

[11]Sheriff Salazar agreed a third woman, Barbara Garcia, verified Ms. Flecksteiner's report as well, although her statement is not in the record.

[12]She wrote, "[t]he other women will not back me up - they will probably ostracize me for this. Frankly, I don't care. I would like to do my time in peace & be left alone. I see no reason for our privileges to be up to the whims of Sgt. Gonzales. . . ."

Sometime in 1997, Stella Noga,[13] who had served time at the Jail, met with Huerfano County Commissioner Charles Montoya at his office and complained of sexual and drug-related activities at the Jail, as well as her inability to get her prescription drugs. Commissioner Montoya testified he met with Sheriff Salazar who "thought maybe it was a personal vendetta, or to that effect. Because Stella was kind of – I don't know how you would describe her, but I think kind of an arrogant little girl. And she did occasionally cause problems, or whatever." Commissioner Montoya explained Ms. Noga's brother, Miguel Duran,[14] is married to his daughter, and he stated, "I know she was a troublemaker."

On October 16, 1997, police officers in Pueblo, Colorado, arrested Dominick, who was hostile and combative after being removed from a local bar for harassing female dancers. Finally restrained with pepper spray, Dominick told officers he was a "cop in Walsenburg" and threatened injury.[15] On October 21, 1997, Sergeant Zudar placed a written warning in Dominick's file for his violating "certain policies . . . one having inmates in the control room," although the additional allegations of sexual misconduct were found unsubstantiated. However, because of the Pueblo arrest, Sergeant Zudar

---

[13]Ms. Noga is also called Stella Duran in the depositions.

[14]Miguel Duran was a sheriff's deputy at the Jail before he was seriously injured while driving a Sheriff's vehicle in a storm.

[15]The bouncers described Dominick as "very big" and were scared by his threats to injure them.

demoted Dominick from sergeant to deputy and placed him on probation for six months, explaining Dominick had "basically been a good officer up until the Pueblo incident and . . . him having inmates in the control room."

Ms. Gonzales further presented evidence of two incidents between October 1997 and October 1998, when the present sexual assaults occurred, to demonstrate the unsafe atmosphere remained at the Jail. First, she listed an incident report in which an inmate wrote that Dominick punched him after he had been restrained by other officers who had left him alone with Dominick. Second, in April 1998, inmate Denise Tefteller wrote a letter to Sheriff Salazar describing Dominick's mercurial temperament and arbitrary system of rewards and punishments based on his mood.[16] In an affidavit, Ms. Tefteller stated that when she was released, she gave her letter to Major Bob and asked him to give it to Sheriff Salazar. In 2000, Sheriff Salazar responded to this affidavit in Ms. Guel's civil action, stating he never saw the letter before his attorney handed it to him at that time. He attested that prior to the October 1998 incidents, "I had never received any *substantiated* information concerning prior sexual improprieties by these Detention Officers." (emphasis added).

---

[16]She described his angrily answering her call after her "blood pressure shot up," saying "he had a bone to pick with me. Didn't I know Bob tells him everything I tell him (Bob) & who they have in the control room is their business? (Referring to the Monday night party.)" She wrote that Dominick "seems to enjoy" antagonizing inmates. "I'm afraid someone, someday, is going to hurt that boy badly."

Finally, Ms. Gonzales described in detail Major Bob's sexual assault on October 13, 1998, accompanied by the investigative report of the District Attorney's Office. She also included Sheriff Salazar's incident report in which he noted the on duty officer's concern the two female inmates' complaints involved Major Bob and Dominick and the "females were showing signs of emotion as far as being upset. I then read the other statement which will be done on a separate report. I then instructed Officer sierra [sic] to inform these females that he notified me and that the statements they provided would be Investigated [sic]" and that he would speak to them in the morning. Sheriff Salazar described interviewing Ms. Guel and his meeting with Ms. Gonzales and her public defenders. At that time, approximately 2:30 p.m., shortly after Ms. Gonzales' second encounter with Major Bob, Sheriff Salazar wrote in his report Ms. Gonzales, on the advice of counsel, refused to speak with him, telling him he had her statement from the night before. Shortly after, he acknowledged the District Attorney's order to release both women.

The Magistrate Judge rejected all of Ms. Gonzales' evidence of prior events either as insubstantial and unsubstantiated or disconnected from any specific evidence that Major Bob, the jail administrator, posed a substantial risk; that is, the generalized atmosphere of the Jail would not suffice. Instead, "Salazar's deliberate indifference must be tied specifically to acts of [Major Bob] of which Salazar was aware." Hence, to prove Sheriff Salazar's deliberate indifference, the Magistrate Judge, citing *Hovater v.*

*Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993), and *Lopez v. LeMaster,*172 F.3d 756, 761 (10th Cir. 1999), asserted "plaintiff must present evidence that would establish that Salazar had knowledge of facts that would lead to an inference that [Major Bob], not other deputies, presented a 'substantial risk of harm.'" Embracing this recommendation, the district court exonerated Sheriff Salazar from any constitutional consequence, finding, because Ms. Gonzales refused to speak with him, "he was unable to do anything." The court further found Sheriff Salazar "took appropriate remedial measures at the time" in addressing past conduct, evidencing "his policy to take appropriate remedial measures when anything was reported to him, including investigation and further disciplinary action where appropriate." In granting the motion for summary judgment, the court concluded Ms. Gonzales failed to present a triable issue of fact Sheriff Salazar knew Major Bob posed a substantial risk of harm to her.

### III. Summary Judgment

The district court adopted the Magistrate Judge's order denying Ms. Gonzales' Eighth Amendment claim on the merits. Having found no constitutional violation in the first instance, neither the Magistrate Judge nor the district court ruled on the issue of qualified immunity; thus, we do not review summary judgment here "somewhat differently than other summary judgment rulings." *Hovater*, 1 F.3d at1066, citing *Hannula v. City of Lakewood*, 907 F.2d 129, 130 (10th Cir. 1990). Rather, we review the district court's grant of summary judgment on the merits of Ms. Gonzales' Eighth

- 12 -

Amendment claim de novo, applying the same legal standard used by the district court under Fed. R. Civ. P. 56(c) and viewing the evidence in the light most favorable to the nonmovant. *Seymore v. Shawver & Sons, Inc*., 111 F.3d 794, 797 (10th Cir. 1997). Summary judgment is appropriate only if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Thus, we ask the "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[17]

IV. Deliberate Indifference

We preface each foray into this difficult area ("Prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another." *Farmer*, 511 U.S. at 858 (Thomas, J., dissenting)) with the Eighth Amendment proviso requiring "prison officials to 'provide humane conditions of confinement,' which includes taking 'reasonable measures to guarantee the safety of inmates.'" *Giron v. Corr. Corp. of America*, 191 F.3d 1281, 1285 (10th Cir. 1999), quoting *Farmer*, 511 U.S. at 832; see also, *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998). Thus, in a claim that officials failed to prevent harm, an inmate must

---

[17]This standard of review does not ignore the fact that, in the end, defendant still bears the usual summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002).

show, first, "she is incarcerated under conditions posing a substantial risk of serious harm," and, second, that officials had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "Thus, the deliberate indifference standard in a prison-conditions case is a 'subjective' and not an 'objective' requirement. That is, a prison official is liable only if the 'official knows of and disregards an excessive risk to inmate health and safety.' It is not enough to establish that the official should have known of the risk of harm." *Pulsipher*, 143 F.3d at 1310 (quoting *Farmer*, 511 U.S. at 837).

Further, as stated in *Pulsipher*, a plaintiff's uncontroverted claim of "deprivations resulting from sexual assault" are "sufficiently serious to constitute a violation under the Eighth Amendment." *Id.* In both *Hovater* and *Pulsipher*, however, a constitutional violation was not found because the only proof of prison officials' knowledge of a substantial risk of serious harm to a female inmate and failure to protect was predicated on the existence of a per se violation of a written jail policy. In *Hovater*, the policy dictated that a male guard never enter a woman's cell alone, except in an emergency, 1 F.3d at 1068; and, in *Pulsipher*, two jailers were required to be present when female prisoners were removed from their cell, 143 F.3d at 1310-1311. We explicitly stated in *Hovater*, however, "[h]ad Sheriff Hill possessed information that Mr. Robinson as an individual posed a threat to the safety of female inmates, our decision would be different." 1 F.3d at 1068.

Material facts remain in dispute on Ms. Gonzales' Eighth Amendment claim that stand in stark contrast to the absence of any such evidence in *Hovater* and *Pulsipher*. Here, Ms. Gonzales did not rely upon any official policy which could be substituted for Sheriff Salazar's knowledge the Huerfano County Jail where she was assaulted was not a safe place.[18] Instead, viewing the evidence in a light most favorable to her, as we must, it may be fairly inferred Sheriff Salazar's purported ignorance of the dangerous conditions in the jail was a direct result of his lackadaisical attitude toward his responsibility to run the institution. An inference of the sheriff's lack of responsiveness can also be drawn from other facts.

First, Sheriff Salazar explicitly stated his Jail Administrator did not want to investigate allegations of problems at the Jail. Second, the evidence indicates the sheriff's consistent willingness to ignore inmate complaints by attributing them to attitudes of the complainants, characterizing them as "troublemakers" or "conjuring up" incidents to "discredit" his deputies," allowed him to excuse his failure to pursue the issues any further. Finally, and most astonishing, when first advised two visibly "upset" female inmates accused two of his jailers of sexually assaulting them, he not only left the prisoners unprotected in the jail, but also in the custody and control of the very men

---

[18] Indeed, in 2002 deposition testimony submitted in Defendants' supplemental appendix, Sheriff Salazar described instituting written policies and procedures, including hiring additional female staff and new hiring practices, to address a 2001 incident involving four counts of sexual assault of a female inmate by a male detention officer in the Jail.

accused of the assaults.  When the women were removed for their protection, the decision to do so was not made by Sheriff Salazar, but by the District Attorney.  None of this evidence is controverted, and its significance was seemingly ignored by the district court.

Finally, we are constrained to note the district court misread *Farmer*, believing it required Ms. Gonzales to show Sheriff Salazar specifically knew Major Bob posed a substantial risk of harm to *her*.  Rather, the *Farmer* Court noted a prison official could not escape liability by showing although "he was aware of an obvious, substantial risk to inmate safety, he did not know that *the complainant* was especially likely to be assaulted *by the specific prisoner* who eventually committed the assault."  511 U.S. at 843 (emphasis added).  "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."  *Id.*

The undisputed evidence of the physical assaults on inmates set against the facts of Sheriff Salazar's knowledge of reported risks to inmate health or safety, including the documented lapse of security in the control room, complaints of sexual harassment and intimidation, Dominick's demotion for, as Sergeant Zudar characterized it, "a combination of things," as well as the presence in the record of Ms. Tefteller's letter, which she attested was handed to Major Bob, surely raise a reasonable inference that Sheriff Salazar knew of and disregarded an excessive risk to Ms. Gonzales.  Under these circumstances, at the least, Ms. Gonzales has raised a triable issue of material fact that Sheriff Salazar had the

"requisite knowledge of a substantial risk," which, *Farmer* acknowledges, may be demonstrated "in the usual ways, including *inference* from circumstantial evidence." 511 U.S. at 842 (emphasis added).

In the interstice between the facts presented and the inferences arising from evidence of Sheriff Salazar's knowledge of activities at the Jail, this triable issue was prematurely dismissed at the summary judgment stage. Left on remand is for the trier of fact, then, to decide whether these inferences are sufficiently strong to cast constitutional responsibility on Sheriff Salazar's conduct. We therefore **REVERSE** the district court's order granting summary judgment and **REMAND** for further proceedings.