**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 21, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MICHELLE TAFOYA,

Plaintiff-Appellant,

v.

HUERFANO COUNTY SHERIFF
JOHN SALAZAR,

Defendant-Appellee,

and

ALAN RUIZ,

Defendant.

No. 06-1191

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 02-CV-2378-RPM)**

---

Jennifer Bisset, Bisset Law Firm, Englewood, Colorado, for Plaintiff-Appellant.

Andrew D. Ringel (David R. Brougham with him on the brief), Hall & Evans, L.L.C., Denver, Colorado, for Defendant-Appellee.

---

Before **KELLY**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

From 1995 to 2003, John Salazar served as the elected sheriff of Huerfano County, Colorado, responsible for the management and supervision of the Huerfano County Jail. In 1998, two independent incidents of sexual assault occurred in the jail, both perpetrated by male detention officers against female inmates. In *Gonzales v. Martinez*, 403 F.3d 1179 (10th Cir. 2005), we found evidence that these assaults were the product of unconstitutional jail conditions maintained through the deliberate indifference of Sheriff Salazar, and noted many ways in which his administration of the jail fell below an acceptable standard. Three years after the assaults, on December 21, 2001 and again on December 30, 2001, plaintiff-appellant Michelle Tafoya was sexually assaulted by detention officer Alan Ruiz. Mr. Ruiz was later arrested for and convicted of the assaults.

Ms. Tafoya brings this civil action under 42 U.S.C. § 1983 against Sheriff Salazar and Mr. Ruiz.[1] Ms. Tafoya claims that Sheriff Salazar demonstrated deliberate indifference to the rights of inmates in his care and custody, subjecting her to cruel and unusual punishment in violation of the Eighth Amendment. The district court granted Sheriff Salazar's motion for summary judgment, concluding that Ms. Tafoya had failed to provide evidence that Sheriff Salazar was actually aware of a substantial risk of harm to female inmates or to show a causal connection between his managerial deficiencies and the sexual assaults committed

---

[1]Mr. Ruiz failed to respond to the complaint and the district court entered a default judgment against him. Order of Dismissal, Doc. 72 (Jan. 30th, 2007).

-2-

by Mr. Ruiz. Because we find that Sheriff Salazar was aware of prison conditions that were substantially likely to result in the sexual assault of a female inmate, and conclude that a jury might infer that the assaults on Ms. Tafoya were caused by these dangerous conditions, we reverse.

## I. Background

In December, 2001, Ms. Tafoya was serving a one-year sentence at the Huerfano County Jail. Through her good behavior, Ms. Tafoya earned an appointment as a jail trustee. Jail trustees perform cooking and cleaning duties in exchange for a sentence reduction. At the time of the assaults, Ms. Tafoya was the only female trustee.

On December 21, 2001, Mr. Ruiz called Ms. Tafoya out of her cell to take the trash to the dumpster — one of her trustee duties. Mr. Ruiz escorted Ms. Tafoya outside to the dumpster, in violation of a jail policy that required female trustees to be accompanied by a female officer while cleaning or taking out the trash. Ms. Tafoya then returned to the kitchen to clean, where she was sexually assaulted by Mr. Ruiz. Ms. Tafoya did not immediately report the assault because she feared that she would not be believed by the other officer on duty and would have her trustee status revoked.

On December 30, 2001, Mr. Ruiz was working the graveyard shift from 12:00 a.m. to 8:00 a.m. Ona Garcia, a female officer, was stationed in the control room where she could monitor the hallway leading to the kitchen over the

surveillance cameras. There was no camera inside the kitchen. Ms. Tafoya entered the kitchen to perform her cooking and cleaning duties. While she was there, Mr. Ruiz entered, again in violation of the jail's "no-contact" policy between male detention officers and female inmates. He informed Ms. Tafoya that Ms. Garcia was asleep in the control room and sexually assaulted Ms. Tafoya a second time.

Mr. Ruiz was not the first Huerfano County Jail detention officer to sexually assault a female inmate at the jail. Detention officers Robert Martinez and Dominick Gonzales sexually assaulted two female inmates in 1998. Both were convicted and imprisoned for the offenses. Sheriff Salazar faced three civil suits as a result of these assaults. *See Gonzales*, 403 F.3d at 1179 (reversing the grant of summary judgment by the district court).

After the 1998 assaults, Sheriff Salazar took some steps to remedy the risk to female inmates of sexual assault. He fired Robert Martinez, the jail administrator and perpetrator of one of the assaults. He installed four additional surveillance cameras to cover unmonitored locations in the jail, including areas where the 1998 assaults had occurred, but not including the kitchen where the assault against Ms. Tafoya later took place. He also hired additional female staff and implemented a half day sexual harassment training on November 7, 2001, which Mr. Ruiz attended. The question we address here is whether, notwithstanding these steps, Sheriff Salazar's alleged failure to implement and

-4-

enforce other policies to protect female inmates amounted to deliberate indifference in violation of the Constitution.

## II. Discussion

### A.

The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Ramos v. Lamm*, 639 F.2d 559, 566 (10th Cir. 1980). However, this minimum standard does not impose constitutional liability on prison officials for every injury suffered by an inmate. First, the alleged injury or deprivation must be sufficiently serious. The official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Farmer* 511 U.S. at 834. There is no question that sexual assault of the kind suffered by Ms. Tafoya meets this objective component of an Eighth Amendment claim. *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993) ("[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards.").

Second, because the Eighth Amendment prohibits only cruel and unusual punishment, the prison official must have a sufficiently culpable state of mind to violate the constitutional standard. The standard of culpability necessary to an Eighth Amendment violation is one of deliberate indifference. "[A] prison

-5-

official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . ." *Farmer*, 511 U.S. at 837. The standard is subjective, requiring that the official actually be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation. *Id*. at 844. The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur. *Id.* at 843 (finding liability even though the prison official "did not know that *the complainant* was especially likely to be assaulted *by the specific prisoner* who eventually committed the assault."). "It does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of assault for reasons personal to him or because all prisoners in his situation face such a risk." *Gonzales*, 403 F.3d at 1187 (quoting *Farmer*, 511 U.S. at 843). However, even if a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk. *See LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993).

Although deliberate indifference is a subjective inquiry, a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition. *Farmer*, 511 U.S. at 842. "[I]f a risk is obvious, so that a reasonable man would realize it, we might well infer that [the prison official] did in fact realize it." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (quoting 1 W. LaFave & A. Scott, *Substantive Criminal Law*, § 3.7, at 335 (1986)). In response, the defendant may present evidence to show that he was in fact unaware of the risk, in spite of the obviousness.

**B**.

After the 1998 assaults, Sheriff Salazar was on notice of the dangerous conditions in the jail and was aware that his own indifference toward jail operations had contributed to those conditions. Given his knowledge, Sheriff Salazar was under a duty not only to take reasonable measures to remedy the circumstances that directly led to the sexual assaults, but to cure his own lack of attention and unresponsiveness to inmate complaints and other indicators of serious problems with his detention staff.

**1.**

In *Gonzales v. Martinez*, 403 F.3d 1179 (10th Cir. 2005), we described the egregiously undisciplined behavior of the detention staff at the Huerfano County Jail prior to 1998, and Sheriff Salazar's "lackadaisical attitude toward his

responsibility to run the institution." *Id.* at 1187. In *Gonzales*, we specifically

called attention to Sheriff Salazar's failure to adequately address inmate

complaints, conduct employee reviews and background checks, be physically

present at the jail, and discipline the inappropriate conduct of detention officers.

Because the opinion extensively laid out the deficiencies in Sheriff Salazar's

performance, we will summarize these deficiencies in some detail.

As noted in *Gonzales*, Sheriff Salazar did not take an active role in the

investigation of inmate complaints, in spite of his knowledge that his jail

administrator did not take complaints seriously and was actively opposed to

investigations. *Id.* at 1183, 1187. Those few complaints that were brought to

Sheriff Salazar's attention he dismissed by "attributing them to attitudes of the

complainants, characterizing them as 'troublemakers' or 'conjuring up' incidents

to 'discredit' his deputies." *Id.* at 1187. Furthermore, Sheriff Salazar did not

conduct regular employee evaluations, either to discipline poor performance or to

determine which officers ought to be placed in positions of responsibility. *Id.* at

1183. He also did not conduct regular criminal background checks on his

employees, and knowingly hired employees with criminal records showing a

propensity for violent and dangerous behavior.[2]

---

[2]Sheriff Salazar admitted that he hired Dominick Gonzales even though his record indicated a DWAI and a period of six months probation for "fighting." App. 521. Sheriff Salazar also admitted that he "had to" have seen Mr. Ruiz's criminal record which indicated an arrest and conviction for "resistance,

(continued...)

As further noted in *Gonzales*, Sheriff Salazar rarely visited the jail, allowing the undisciplined behavior of his staff to continue unchecked and unnoticed by him. *Id.* at 1183. The incidents that were documented suggest that disorderly behavior and debauchery were pervasive throughout the jail's operations. For example, in a recorded incident, a detention officer allowed intoxicated inmates into the control room to learn how to operate the jail's controls. *Id.* There were also several complaints by female inmates of sexual harassment and intimidation by Dominick Gonzales, one of the detention officers. In 1997, Mr. Gonzales entered the female dormitory and exposed himself to the inmates. He also made inappropriate comments to female inmates over the intercom, taunting the women to lift their shirts and expose themselves to the security cameras. *Id.* Mr. Gonzales was demoted for this behavior, in conjunction with another incident in which Mr. Gonzales was arrested at a local bar for harassing female dancers and threatening injury to the arresting officers, but this discipline did not prevent him from assaulting Amanda Guel in 1998. *Id.* at 1184–87.

Ms. Tafoya claims that many of the same deficiencies identified by this Court in *Gonzales* remained uncorrected thereafter, and were responsible, in part, for her assault by Mr. Ruiz.

_____

[2](...continued)
destruction of city property, disturbance, and assault," and a three months suspended license for DWAI. App. 555.

**2.**

After the 1998 assaults, Sheriff Salazar made only minimal efforts to address the glaring safety problems at the jail. He established a "no-contact" policy for male officers and female inmates, installed several new surveillance cameras, hired additional female staff, and provided for a half-day staff training by an outside agency regarding the prohibition against sexual contact between staff and inmates. However, Ms. Tafoya provided evidence to show deliberate indifference by Sheriff Salazar, in spite of these reforms, including the fact that he made no effort to alter his own managerial strategy, impose a serious threat of discipline for policy violations upon his detention staff, or establish an adequate grievance procedure by which inmates could report officer misconduct with a reasonable expectation of serious investigation. In additional support of her claims, Ms. Tafoya offered the expert testimony of Tom Dalessandri to substantiate the degree to which conditions at the Huerfano County Jail deviated from generally accepted standards.[3]

A prison official may be liable for a substantial risk of serious harm to inmates in spite of efforts reasonably calculated to reduce the risk, if he intentionally refuses other reasonable alternatives and the dangerous conditions

---

[3] Tom Dalessandri served for twenty years in law enforcement, including eight years as sheriff of Garfield County, Colorado. He is a member of the National Sheriffs' Association, the Garfield County Jail Advisory Board, and a Chairman in the County Sheriffs of Colorado.

persist.  In *LaMarca*, 995 F.2d 1526, the court found that the plaintiffs presented sufficient evidence to avoid summary judgment even though Mr. Turner, the superintendent of the facility in question, provided evidence that he had made efforts to improve safety conditions: "he attempted to secure additional funds, make improvements to GCI's physical plant, expand recruitment efforts, and institute policies that would have reduced the risk of violence if his staff had followed them."  *Id.* at 1537.  This evidence was, however, matched by plaintiffs' evidence that Mr. Turner did not take any steps to minimize other serious problems at the facility, including "(1) improper and inadequate staff training . . . (2) a staff out of control who did not report rapes, assaults, and illegal activities . . . (3) [f]ailure to supervise staff . . . [and] (4) failure to employ any standard procedure to investigate incidents of alleged rapes. . . ."  *Id.* at 1537–38.  Similarly, although Sheriff Salazar instituted some new safety measures, they were insufficient to prevent liability because there is evidence that he ignored numerous other problems of which he had knowledge and for which he was aware of remedies that he chose not to implement.

Sheriff Salazar's "no-contact" policy might have reduced the opportunity for assaults on female inmates by male detention officers if it had been enforced.  However, Ms. Tafoya provided testimony that the policy was frequently violated, in part because there was not always a female detention officer on duty.  The knowing failure to enforce policies necessary to the safety of inmates may rise to

the level of deliberate indifference. *See*, *LaMarca*, 995 F.2d at 1537 (finding deliberate indifference where prison official "failed to ensure that his direct subordinates followed the policies he established"); *Goka v. Bobbitt*, 862 F.2d 646, 652 (7th Cir. 1988) (holding that failure to enforce a policy where the policy is critical to inmate safety may rise to the level of deliberate indifference). Even with adequate staffing, an oral "no-contact" policy is an empty gesture without corresponding supervision and a legitimate threat of discipline for infractions. In his report on the Huerfano County Jail, Mr. Dalessandri emphasized the lack of supervision and enforcement of policies by Sheriff Salazar that resulted in an undisciplined and unprofessional staff: "Sheriff Salazar allowed his staff to ignore the policies and procedures he laid out through his lack of follow up, investigation, and discipline . . . contact with female prisoners was a common practice." App. 211, 215. "Sheriff Salazar failed to remedy violations of policy and law . .. allowing individuals to believe that their acts had no consequences, robbing the Sheriff of his own credibility and leaving the staff with the sense that 'anything goes.'" App. 216. Sheriff Salazar explicitly agreed in his testimony that policies alone are not enough to stop a detention officer from committing a sexual assault. A jury might conclude from this statement that Sheriff Salazar was aware that his failure to enforce the no-contact policy would likely lead to widespread violation by the detention staff.

Even beyond nonenforcement of the no-contact policy, the undisciplined culture of "anything-goes" among the detention officers remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management. Mr. Gene Tafoya, one of the detention officers at the jail,[4] testified that detention officers would arrive to work out of uniform, would sleep through their shifts, would be intoxicated while working, and would watch pornographic movies in the control room while on duty. Mr. Tafoya also testified that on several occasions Mr. Ruiz commented that he would like to have sex with certain female inmates and stated that he would like to see the female inmates with their "feet in the air." App. 219. From such evidence of pervasive delinquency on the part of his staff, a jury might reasonably conclude that Sheriff Salazar was either aware of their behavior or aware that his lack of attention might result in dangerous conditions, particularly in light of the prior assaults.

To improve surveillance, Sheriff Salazar installed four additional cameras in the jail after the 1998 assaults. We agree that additional surveillance equipment was a reasonable response to the presence of blind spots where assaults could, and did, take place. However, Sheriff Salazar knew that blind spots remained even after the installation of the new cameras, and knew that having some cameras in

---

[4]Gene Tafoya is plaintiff-appellant Michelle Tafoya's uncle. Although this relationship may present a question of credibility, we do not consider credibility on a motion for summary judgment. *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000).

the jail was not enough to deter assaults in unmonitored areas.[5] *See Gonzales*, 403 F.3d at 1181 n.5. Detention officers and inmates were aware of the unmonitored locations where illegal activity could take place out of sight of personnel in the control room. The kitchen where Ms. Tafoya was assaulted contained only a malfunctioning audio surveillance device, leaving Ms. Tafoya vulnerable to an attack. Sheriff Salazar claims that he did not install more surveillance cameras because of budget constraints. Whether or not he failed to install more cameras out of deliberate indifference or lack of funding is a genuine issue of material fact to be considered by a jury.

Sheriff Salazar knowingly continued to employ detention officers with criminal records. He admits that he reviewed Mr. Ruiz's application for employment prior to his hiring, which included a background check showing a DWAI conviction, a conviction for assault, and an arrest for resistance, destruction of city property, disturbance, and assault. After hiring, Sheriff Salazar failed to conduct any regular review of his employees. While employed at the jail, Mr. Ruiz was arrested for domestic violence in 1998 and DWAI in 2001. Mr. Dalessandri explained in his report that periodic evaluations including criminal background checks could have identified staff members that posed a particular threat to inmates. Contrary to the conclusion of the district court that

---

[5] Sheriff Salazar stated that in 1998 there were no surveillance cameras in the control room where Ms. Guel was assaulted nor in the library or commissary areas were Ms. Gonzales was assaulted. App. 551.

-14-

"[t]here is nothing in the submitted record to suggest that the defendant Salazar had any knowledge that Ruiz had a proclivity toward sexual crimes," *Tafoya v. Salazar*, 2006 WL 827288, *2 (D. Colo. March 28, 2006), Mr. Dalessandri stated in his report that prior history of even minor crimes may indicate that the individual ought not to be trusted with the responsibilities required of detention officers.

Sheriff Salazar also failed to implement regular training programs in spite of the availability of such programs offered at little or no cost through organizations such as the County Sheriffs of Colorado, the National Sheriffs Association, the National Institute of Corrections in Colorado, and the American Jail Association, which give information and support to sheriffs regarding management and training of detention staff. To be sure, Sheriff Salazar implemented a half day training course on sexual harassment on a single occasion in November 2001. This demonstrates that the Sheriff was aware of the need for training, but a reasonable jury could conclude that this effort fell far short of what was reasonably required.

Perhaps most troubling, Sheriff Salazar failed to implement an adequate grievance procedure through which inmates could make complaints without fear of retribution, and which included serious investigation and response. In *Gonzales*, we found that Sheriff Salazar's casual dismissal of complaints by inmates was an example of his deliberate indifference. 403 F.3d at 1187. Despite

the assaults against Ms. Guel and Ms. Gonzales, which should have served as a wake-up call, Sheriff Salazar "failed to assert clear guidelines for female inmates assuring them that complaints against staff would be acted upon decisively and promptly without prejudice ... [and] failed to involve himself by staying aware of developing investigations and decisively affecting the outcome." App. 215–16 (expert report). To make matters worse, Sheriff Salazar's jail administrator told inmates that Sheriff Salazar would back up his officers "one hundred percent," making clear that any efforts to file a grievance would be futile. App. 136. Mr. Dalessandri's report provides evidence that with an appropriate grievance procedure, "the inmate should be made to feel comfortable in filing a complaint and have every expectation that it will be investigated fairly and without bias." App. 190. In contrast, Ms. Tafoya testified that she was afraid to report the first assault by Mr. Ruiz because "I didn't think anybody would believe me . . . if I went through the jailers . . . they would try to cover it up, or try to say it was my fault." App. 135.

In 2001, the jail administrator eliminated the grievance system entirely because there were "too many complaints." App. 82. Although there is no direct evidence in the record that Sheriff Salazar was actually aware of the elimination of the grievance procedure, a jury might reasonably conclude that Sheriff Salazar must have been aware of a significant obstacle to the filing of complaints based on their sudden scarcity as compared to the former inundation.

**3.**

As was true in *Gonzales*, Ms. Tafoya has presented evidence of disputed material facts sufficient to create a genuine question as to whether Sheriff Salazar was deliberately indifferent to the conditions at the Huerfano County Jail. In *Hovater v. Robinson*, 1 F.3d 1063 (10th Cir. 1993), and *Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998), we did not find a constitutional violation because the only proof of prison officials' knowledge of a substantial risk of serious harm to a female inmate was the violation of written jail policy. "[A] prison official is liable only if the 'official knows of and disregards an excessive risk to inmate health and safety.' It is not enough to establish that the official should have known of the risk of harm." *Pulsipher*, 143 F.3d at 1310 (quoting *Farmer*, 511 U.S. at 837). Unlike the absence of any such evidence in *Hovater* and *Pulsipher*, Ms. Tafoya provided testimony that would allow a reasonable jury to infer that Sheriff Salazar knew of the dangerous conditions at the jail and deliberately elected not to remedy them. Indeed, the timing of discovery in Ms. Gonzales' suit against Mr. Martinez and Sheriff Salazar and the content of that evidence as we discussed in our opinion in *Gonzales*, reveals that Sheriff Salazar must have been informed of deficiencies in his jail administration leading to sexual assaults on female inmates by jail personnel through the process of discovery.[6] Yet even

---

[6] The three civil suits against Sheriff Salazar were filed on July 21, 1999, October 8, 1999, and January 28, 2000. The district court docket in *Gonzales*

(continued...)

-17-

after the three civil suits for the 1998 assaults were filed against him, Sheriff Salazar continued to abstain from any meaningful presence at the jail, did not ensure an adequate grievance procedure was in place, and vested responsibility for jail management in unqualified administrators and supervisory staff with criminal histories. Just as in *Gonzales*, "it may be fairly inferred Sheriff Salazar's purported ignorance of the dangerous conditions in the jail was a direct result of his lackadaisical attitude toward his responsibility to run the institution." 403 F.3d at 1187.

## C.

The district court found that Ms. Tafoya presented insufficient evidence regarding Sheriff Salazar's knowledge of the substantial risk of harm to female inmates at the jail because of passage of three years between the 1998 assaults and the assault on Ms. Tafoya in 2001. Although Sheriff Salazar is correct that no grievances were filed during this time period, this argument rings hollow given that there was no grievance procedure in place, and both inmates and staff were actively discouraged from making complaints. The elimination of the grievance procedure and the corresponding lack of complaints is indicative of the very supervisory problems with the Huerfano County Jail from which a jury might

---

[6](...continued)
reveals that, at least in that case, discovery and additional discovery based on defendant's motion to dismiss had been completed prior to May 31, 2001 when the plaintiff's response brief was filed. *See* Docket sheet, *Gonzales v. Martinez*, No. 99-CV-1152 (D. Colo., filed June 21, 1999).

infer that Sheriff Salazar was aware of the likelihood that an assault would take place.

Sheriff Salazar additionally argues that even if he were deliberately indifferent to some conditions in the jail, this particular assault did not result from those conditions. Section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982). The relevant inquiry is "whether an official's acts or omissions were the cause — not merely a contributing factor — of the constitutionally infirm condition." *LaMarca*, 995 F.2d at 1538. However, "[i]f a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is precluded from contending that the unconstitutional condition was not at least a proximate cause of . . . injuries that arose from that condition." *Id*. (internal quotation marks omitted).

Sheriff Salazar argues that his management decisions did not proximately cause Mr. Ruiz to sexually assault Ms. Tafoya, and to hold him accountable for actions taken by Mr. Ruiz, when Mr. Ruiz had no history of sexual misconduct, is essentially to adopt a theory of *respondeat superior*. However, acts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault.

-19-

*See Hale v. Tallapoosa County*, 50 F.3d 1579, 1585 (11th Cir. 1995) ("[A] reasonable jury could find that the beating was caused by the excessive risk of harm which resulted from the atmosphere of deliberate indifference."); *LaMarca*, at 1538 ("[D]ue to [their] very nature as acts of violence, the rapes that occurred are not isolated incidents of sexual conduct, but rather flow directly from [the] lawless prison conditions ...").

The defendant's concern that our holding here effectively imposes a theory of *respondeat superior* is misplaced. At the summary judgment stage, the requirement of deliberate indifference imposes a burden on the plaintiff to present evidence from which a jury might reasonably infer that the prison official was actually aware of a constitutionally infirm condition. Although a plaintiff may satisfy this burden by offering circumstantial evidence of the prison official's knowledge, because a jury is permitted to infer deliberate indifference based solely on the obviousness of the threat posed to inmates, *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001), the mere showing of negligence by an employee over whom the official exercised supervisory responsibility is insufficient for liability to attach. A prison official may only be held liable if a jury finds that he first had actual notice that a constitutional violation was substantially likely to occur.

## III.

Because Ms. Tafoya did not address the dismissal of her state law claims in her opening brief, she has waived her state tort claims. *Harman v. Pollock*, 446 F.3d 1069, 1082 n.1 (10th Cir. 2006); *Silverton Snowmobile Club v. United States Forest Service*, 433 F.3d 772, 783 (10th Cir. 2006).

We **REVERSE** the judgment of the district court dismissing the plaintiff's § 1983 claim, **AFFIRM** the dismissal of her state tort claims, and **REMAND** for further proceedings.