**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 9, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TRACY KEITH,

     Plaintiff - Appellant

v.

RICHARD D. KOERNER,

     Defendant - Appellee,

and

ANASTACIO GALLARDO,

     Defendant.

No. 15-3219

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:11-CV-02281-DDC)**
_____

Ann Marie Duffy, Mayer Brown LLP, Washington, District of Columbia (John Kurtz, Hubbard & Kurtz, LLP, Kansas City, Missouri, with her on the briefs), for Plaintiff-Appellant.

John Wesley Smith, Assistant Attorney General, Office of the Attorney General for the State of Kansas, Topeka, Kansas, for Defendant-Appellee.

_____

Before **HARTZ**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

While incarcerated at the Topeka Correctional Facility (TCF), an all-female state prison, Tracy Keith was raped by a prison maintenance employee. Ms. Keith filed a § 1983 suit alleging that prison officials—including Warden Richard Koerner—violated her Eighth Amendment rights by creating an environment in which sexual misconduct was likely to occur. The district court granted summary judgment to Warden Koerner based on qualified immunity. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I.    BACKGROUND[1]

### A.  *Factual History*

Tracy Keith was incarcerated at TCF from November 2006 to May 2010. During Ms. Keith's first year at TCF, Richard Koerner was warden and Anastacio "Ted" Gallardo was a maintenance instructor. Mr. Gallardo taught a vocational plumbing class for a group of inmates, including Ms. Keith and Sandra McMillan.

On October 1, 2007, Ms. McMillan proposed that Ms. Keith "would be helped out financially" if she had a "sexual interaction" with Mr. Gallardo. Ms. Keith agreed to perform oral sex but said she would not have intercourse with Mr. Gallardo. The next day, Mr. Gallardo, Ms. Keith, and Ms. McMillan left the plumbing class under the pretense of picking up a sink and went to an old gymnasium used for storage. The group

---

[1] We described Ms. Keith's basic factual allegations in *Keith v. Koerner* (*Keith I*), 707 F.3d 1185, 1187 (10th Cir. 2013), where we affirmed the district court's denial of Warden Koerner's motion to dismiss. With the benefit of discovery, the parties presented a more complete version of the facts at summary judgment. We therefore provide additional facts relevant to the issues in this appeal.

entered the building and Ms. Keith performed oral sex on Mr. Gallardo, while Ms. McMillan acted as a lookout. Mr. Gallardo then tried to kiss Ms. Keith. When she pulled away, he pulled down her pants and forcibly penetrated her.

About two weeks later, Ms. Keith suspected she might be pregnant. She and Mr. Gallardo discussed abortive options, but Mr. Gallardo soon abandoned his position at TCF, coming to work for the last time on November 5, 2007. Ten days later, TCF administrators received an anonymous note, which read, "Tracy Keith is pregnant. It is Ted Gallardo's." An internal investigation began, including a test that confirmed Ms. Keith's pregnancy. Warden Koerner then referred the case to the Topeka Police Department. Mr. Gallardo was prosecuted in Kansas state court and pled guilty to unlawful sexual relations and two counts of traffic in contraband in a correctional institution. At the end of December 2007, Ms. Keith terminated her pregnancy.

**B.  *Procedural History***

On May 17, 2011, Ms. Keith filed a § 1983 suit against Mr. Gallardo, Warden Koerner, and other TCF and Kansas Department of Corrections (KDOC) employees. When Mr. Gallardo failed to answer, the district court entered default judgment against him. The district court also granted in part a Rule 12(b)(6) motion, dismissing the claims against all other defendants except Warden Koerner. On interlocutory appeal, we affirmed the denial of the motion to dismiss as to Warden Koerner individually. *Keith v. Koerner* (*Keith I*), 707 F.3d 1185 (10th Cir. 2013).

Warden Koerner then filed two motions for summary judgment. He first argued Ms. Keith's claims were barred by the statute of limitations, but the district court denied

3

this motion. Warden Koerner later filed a second motion based on qualified immunity, which the district court granted.

## II. DISCUSSION

Ms. Keith now appeals. Warden Koerner maintains the district court correctly granted summary judgment based on qualified immunity but also argues we can alternatively affirm based on the statute of limitations. Upon reviewing the evidence presented at summary judgment, we conclude genuine issues of material fact preclude summary judgment in Warden Koerner's favor on either basis.

### A. *Qualified Immunity*

"Our review of summary judgment orders in the qualified immunity context differs from that applicable to review of other summary judgment decisions." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citation omitted). Although "we will construe the facts in the light most favorable to the plaintiff as the nonmoving party," *id.*, the plaintiff bears a "heavy two-part burden," *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (citation omitted). But "[w]hile qualified immunity was meant to protect officials performing

4

discretionary duties, it should not present an insurmountable obstacle to plaintiffs seeking to vindicate their constitutional rights." *Lawmaster v. Ward,* 125 F.3d 1341, 1351 (10th Cir. 1997).

## 1. Constitutional Violation

We must first determine whether Ms. Keith has established a constitutional violation. "[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards." *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993). But we address only the claims against Warden Koerner, which require proof that Warden Koerner personally committed a constitutional violation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Thus, it is not enough that Warden Koerner acted in a supervisory role when Mr. Gallardo violated Ms. Keith's constitutional rights. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). Rather, Ms. Keith "must show an 'affirmative link' between [Warden Koerner] and the constitutional violation," which requires proof of three interrelated elements: (1) personal involvement; (2) causation; and (3) state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (quoting *Dodds*, 614 F.3d at 1195).

### a. *Personal involvement*

Before the Supreme Court's decision in *Ashcroft v. Iqbal*, a § 1983 plaintiff had some flexibility in how to establish a supervisory defendant's personal involvement: she could do so by showing personal participation; exercise of control or direction; failure to

5

supervise; or "promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights." *Dodds*, 614 F.3d at 1195. We have since recognized that "*Iqbal* may have changed the § 1983 supervisory liability landscape," but "we have not yet had occasion to determine what allegations of personal involvement . . . meet *Iqbal*'s stricter liability standard." *Id.* at 1198, 1199. In *Dodds*, however, we explained,

> Whatever else can be said about *Iqbal*, . . . we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement . . . of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution.

*Id.* at 1199 (internal quotation marks, citations, and ellipses omitted). Similarly here, we need not define the standard for personal involvement in all instances because Ms. Keith's theories of liability either fail on their merits or fall within the basis of liability we recognized in *Dodds* as surviving *Iqbal*.

To establish personal involvement, Ms. Keith first alleges a failure to train by Warden Koerner. Although we have not determined whether a failure to train satisfies the post-*Iqbal* personal-involvement requirement, the evidence in this case does not support Ms. Keith's theory even under our pre-*Iqbal* precedent. Accordingly, we need not determine whether the failure-to-train theory would be legally sufficient under a heightened standard. Second, Ms. Keith argues Warden Koerner failed to implement and enforce policies that would have prevented the sexual assault by Mr. Gallardo. Because we concluded in *Dodds* that personal involvement may be established by a supervisor's

responsibility for policies, Ms. Keith may rely on the same theory here. We discuss each of these personal liability theories below.

      i.   <u>Failure to train</u>

Turning first to Ms. Keith's failure-to-train theory, a supervising prison official may be liable "[w]here there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir. 1991) (alteration in original) (citation omitted). It is not enough to allege "general deficiencies" in a particular training program. *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). Rather, a plaintiff "must identify a specific deficiency in the [entity's] training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Id.* Ms. Keith has not met this burden.

Ms. Keith relies on a Performance Audit Report (Audit Report),[2] prepared by the Kansas Legislative Division of Post Audit, in which auditors concluded TCF "failed to provide targeted training" related to the unique issues arising in a female-only facility. The Audit Report further stated KDOC does not require or provide specialized training for investigative staff. But in her summary judgment briefing, Ms. Keith admitted that all TCF employees, including Mr. Gallardo, were "given specific training tailored to issues of supervising female inmates and staff-inmate relations."

---

[2] The district court concluded the Audit Report was admissible as a public record under Rule 803(8) of the Federal Rules of Evidence. Because Warden Koerner does not challenge this ruling on appeal, we will consider the Audit Report as evidence relevant to the motion for summary judgment.

7

Even if the Audit Report creates a dispute about the extent of training provided to TCF employees, it does not provide a basis from which a jury could find "essentially a complete failure to train" that made sexual misconduct "almost inevitable." *Houston*, 932 F.2d at 888. The Audit Report identifies only general training omissions, none of which provide a basis from which a jury could conclude that the training of TCF employees was so wholly inadequate that it left employees with the belief they could sexually assault inmates. To the contrary, the evidence confirms Mr. Gallardo received specific training about the impropriety of and potential consequences for engaging in sexual misconduct. *See Schneider*, 717 F.3d at 774 (finding it "unclear how the training advocated by [the plaintiff] would have prevented the assault on her" where the responsible officer was specifically told "that it was unacceptable to engage in sexual relationships with women whom he met through his job").

During orientation, each new TCF employee receives a copy of KDOC Internal Management Policy and Procedure 02-118 (IMPP 02-118), which "absolutely forbids acts of undue familiarity, including sexual misconduct with offenders," and defines "sexual misconduct" as "[s]exual behavior that is directed by an employee toward an offender(s)." Mr. Gallardo certified he read and received a copy of IMPP 02-118 and understood a violation would result in disciplinary action, up to and including dismissal. Mr. Gallardo also confirmed he had read and understood Kan. Stat. Ann. § 21-3520, which makes it a felony for any KDOC employee to engage in unlawful sexual relations, i.e., "consensual sexual intercourse, lewd fondling or touching, or sodomy with" an

inmate. And Mr. Gallardo acknowledged that violation of the statute would be grounds for dismissal and possibly prosecution.

Because Warden Koerner provided multiple, explicit prohibitions against sexual interaction with inmates, we cannot conclude he failed to train his employees in a way that would establish his personal involvement in Ms. Keith's injury. Indeed, we have held that allegations of failure to train were inadequate to support a § 1983 claim where the officer completed a state training program and we found no evidence of a deficiency in the training. *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998). In *Barney*, we further explained that, even if the training was "less than adequate, we [were] not persuaded that a plainly obvious consequence of a deficient training program would be the sexual assault of inmates. Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior." *Id.* Similarly here, there is no evidence that additional training would have prevented Mr. Gallardo's misconduct. Indeed, Mr. Gallardo raped Ms. Keith after acknowledging that engaging in sex with or sexually assaulting an inmate was grounds for termination and criminal prosecution.

ii. Failure to implement and enforce policies

As an alternative basis to establish personal involvement, Ms. Keith asserts Warden Koerner failed to create and enforce policies to protect TCF inmates from misconduct by employees. In particular, Ms. Keith maintains Warden Koerner (1) failed to respond appropriately to misconduct by Mr. Gallardo, (2) overlooked problems within

9

the TCF maintenance department, and (3) failed to enforce policies to curb misconduct throughout TCF generally.

Before reviewing Ms. Keith's evidence in each of these areas, we first pause to explain the two types of conduct relied upon by Ms. Keith. The Audit Report and TCF records document misconduct in the form of "undue familiarity" and "sexual misconduct." "Undue familiarity" includes conduct that "can range from casual conversation all the way to sexual misconduct," whereas "sexual misconduct" is defined as "[s]exual behavior that is directed by an employee toward an offender(s)." As explained below, Ms. Keith correctly asserts it is "clearly established that the Constitution forbids a prison supervisor from acting with deliberate indifference to known risks of sexual assault." But Ms. Keith has not identified case law clearly establishing a warden's personal liability based solely on instances of inappropriate conduct that may be considered undue familiarity but that do not rise to the level of sexual misconduct. Consequently, we distinguish between these forms of misconduct in analyzing Warden Koerner's personal involvement, relying on the evidence relating to undue familiarity to the extent it provides context for the conditions at TCF. *See Gonzales v. Martinez*, 403 F.3d 1179, 1187 (10th Cir. 2005) ("The undisputed evidence of the physical assaults on inmates set against the facts of Sheriff Salazar's knowledge of reported risks to inmate health or safety, including the documented lapse of security in the control room, *complaints of sexual harassment* and intimidation, Dominick's demotion for, as Sergeant Zudar characterized it, 'a combination of things,' as well as the presence in the record of Ms. Tefteller's letter, which she attested was handed to Major

10

Bob, surely raise a reasonable inference that Sheriff Salazar knew of and disregarded an excessive risk to Ms. Gonzales." (emphasis added)). Moreover, because we must "consider the conditions of confinement as a whole" to determine whether Warden Koerner may be liable for a constitutional violation, *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996), we also consider the evidence of undue familiarity as part of the totality of the circumstances present at TCF. Keeping in mind the distinction between undue familiarity and sexual misconduct, we now turn to the evidence presented by Ms. Keith at summary judgment.

1) Misconduct by Mr. Gallardo

Ms. Keith first argues Warden Koerner knew about but ignored previous misconduct by Mr. Gallardo. Ms. Keith cites a July 9, 2007, grievance filed by an inmate named Kelley Lane. Ms. Lane claimed Mr. Gallardo did not supervise the plumbing class, singled her out for negative treatment, and had inappropriate conversations with inmates about drinking, sex, and other personal topics. Ms. Lane was particularly troubled when Mr. Gallardo asked about a tattoo on her boyfriend's genitalia.

Warden Koerner testified he never saw this grievance until his deposition and was unaware of any problems with Mr. Gallardo prior to the incident involving Ms. Keith. But Deputy Warden William Cummings testified he gave Warden Koerner the grievance when it was filed. Viewing this evidence and drawing all reasonable inferences in Ms. Keith's favor, as we must, we assume Warden Koerner received Ms. Lane's grievance and knew about the allegations.

11

Standing alone, however, these facts are insufficient to establish Warden Koerner failed to respond to a known risk that Mr. Gallardo might sexually assault an inmate. Ms. Lane reported conversations that were inappropriately sexual in nature, but none of the allegations suggested Mr. Gallardo might sexually assault an inmate. Mr. Gallardo's conduct toward Ms. Lane is appropriately classified as "undue familiarity." Although Mr. Gallardo was not disciplined for undue familiarity based on Ms. Lane's grievance, TCF officials responded to Ms. Lane's concerns by removing her from Mr. Gallardo's class.

This evidence, viewed in isolation, could not support a finding that Warden Koerner failed to respond to a known risk posed by Mr. Gallardo. It is relevant, however, to our analysis of whether Ms. Keith generally presented evidence sufficient to support a reasonable inference of Warden Koerner's personal involvement in the constitutional violation. *See Gonzales*, 403 F.3d at 1187 ("[A] prison official could not escape liability by showing although 'he was aware of an obvious, substantial risk to inmate safety, he did not know that *the complainant* was especially likely to be assaulted *by the specific prisoner* who eventually committed the assault." (citation omitted)). As a result, we consider Mr. Gallardo's previous undue familiarity in conjunction with other evidence offered by Ms. Keith of problems at TCF, both within the maintenance program and throughout the facility.

2) Problems within the TCF maintenance program

Addressing issues specific to the TCF maintenance program, Ms. Keith relies on the Audit Report's statement that "conditions were ripe for staff misconduct to have occurred in this Program without being detected." Such conditions included (1) minimal

12

supervision and monitoring; (2) lack of a set curriculum; and (3) past instances of improper behavior.

> With respect to monitoring and supervision issues, the Audit Report explains,

> Although cameras were in the classrooms, instructors received sporadic supervision and no additional monitoring. When inmates and instructors were moving around the Facility, no one monitored which inmates were going with which staff person, where they were going, or how long they were gone. Additionally, some buildings where supplies were stored and work orders were being done didn't have cameras.

In addition, Warden Koerner testified that the maintenance program lacked a structured curriculum, which resulted in a failure to provide effective vocational training for the inmates. And Warden Koerner agreed that the maintenance program provided opportunities for employees "to be outside of other people's eyesight, outside of cameras, inside of rooms with individual inmates." Ms. Keith contends that this evidence supports an inference that conditions within the maintenance program contributed to an environment where it was possible for abuse to occur.

According to Ms. Keith, the Audit Report's description of three investigations of maintenance employees in the two years prior to Mr. Gallardo's assault of Ms. Keith, further supports the inference that the maintenance program may be prone to misconduct. These incidents involved "improper behavior with inmates, although that behavior wasn't always sexual misconduct." That is, the incidents involved undue familiarity.

In the first case, "it was alleged that a male staff member was alone with an inmate in a locked room." Both the employee and inmate denied any inappropriate behavior. In response to this incident, Warden Koerner established a policy prohibiting maintenance

13

staff from working alone with an inmate. This policy ultimately proved ineffective here because Ms. McMillan acted as a lookout for Mr. Gallardo while he assaulted Ms. Keith. In the second case, an employee was dismissed after five disciplinary actions, three of which involved undue familiarity. Similarly, the third case involved an employee who had a prior history of undue familiarity and who was dismissed when he gave an inmate work gloves without following a formal request process.

Although these prior disciplinary actions against maintenance employees involved undue familiarity rather than sexual misconduct, "[d]epartment and facility officials told [the state auditors that] most instances of . . . sexual interactions . . . begin with undue familiarity." Thus, we view the incidents of undue familiarity as relevant to the totality of the circumstances at TCF that may have contributed to the sexual misconduct by Mr. Gallardo, although standing alone they do not support a finding of Warden Koerner's personal involvement in the sexual assault of Ms. Keith.

3) Misconduct by TCF employees generally

The impact of the evidence related to Mr. Gallardo and the maintenance program becomes more significant when viewed together with facility-wide practices related to undue familiarity and sexual misconduct. Ms. Keith contends that although TCF policies expressly prohibited sexual misconduct by employees, Warden Koerner's actual practices undermined these formal policies and created an environment where employees engaged in inappropriate behavior without facing meaningful investigation or discipline.

At the time of Ms. Keith's assault in 2007, there were multiple formal policies in place that explicitly prohibited sexual misconduct. KDOC policy IMPP 02-118 forbade

14

any sexual misconduct between employees and inmates. Indeed, the Audit Report recognized KDOC "ha[d] established policies and procedures designed to protect staff and inmates." In addition, effective August 14, 2007, Warden Koerner also enacted General Order 03-108, a policy specific to TCF, which provided "[e]mployees and volunteers shall maintain professional bound[a]ries between themselves and inmates at all times" and reiterated the definitions of undue familiarity and sexual misconduct. By at least 2005, Warden Koerner also implemented use of a Staff-Offender Relationship Checklist which "provide[d] inmates a consistent, uniform and non-threatening means to report inappropriate staff relations involving themselves or other inmates." And as discussed above, in 2006, Warden Koerner instituted a policy prohibiting maintenance staff from working alone with any inmate.

If evidence of these policies had been presented in isolation at summary judgment, we likely would conclude that Warden Koerner is immune from liability for Mr. Gallardo's clear violation of these policies. *See Porro v. Barnes*, 624 F.3d 1322, 1329 (10th Cir. 2010) ("[T]he county actively sought to protect [the plaintiff's] rights and it was (only) [the prison employee's] improper actions, taken in defiance of county policy, that caused [the plaintiff]'s injuries."). But Ms. Keith came forward with additional evidence supporting a reasonable inference that, in practice, Warden Koerner did not enforce these policies.

First, Ms. Keith presented evidence that most cases of employee misconduct at TCF were not seriously investigated. According to the Audit Report, TCF "had far more investigations related to allegations of sexual misconduct than the other two facilities

15

[audited by the state]. At [TCF], 43 of the 74 investigations were related to sexual misconduct—that's 58%. [The other audited facilities] were 9% and 16% respectively." In addition, TCF had far more investigations per one hundred employees than the other two facilities. Per one hundred staff members, TCF initiated 16 investigations for sexual misconduct and 10.1 for undue familiarity. In comparison, the other audited facilities reported .7 and 1.6 investigations for sexual misconduct and 4.6 and 5.2 investigations for undue familiarity, respectively. Although the sheer number of investigations does not establish Warden Koerner's personal involvement, *Lobozzo v. Colo. Dep't of Corr.*, 429 F. App'x 707, 712 (10th Cir. 2011) (unpublished) ("[T]here is no reason to assume the mere number of incidents is sufficient evidence of an unreasonable response to a substantial risk in an isolated case."), Ms. Keith presented evidence that Warden Koerner failed to reasonably respond in the cases represented by these numbers. *See Lopez*, 172 F.3d at 759 ("We recognize at the outset that neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners. They are, however, responsible for taking reasonable measures to insure the safety of inmates." (citation omitted)).

In reviewing the evidence related to Warden Koerner's response to particular instances of misconduct, it is important to reiterate that most of the previously described evidence relates to *undue familiarity*. And there is no claim here that undue familiarity— even if crude, boorish, inappropriate, and disgusting—violates a prisoner's constitutional rights. But Ms. Keith also presented evidence suggesting Warden Koerner condoned practices that created merely an illusion of investigation into prisoner allegations of *sexual misconduct*. To be sure, fact-finding in sexual assault cases is difficult in any

16

setting and more so in the circumstances here. Indeed, the Audit Report acknowledged that

> [l]ack of evidence hampers some investigations. Some situations concern allegations of inappropriate staff actions, such as inappropriate touching, sexual misconduct, smuggling contraband, coercion and pat searches. Often these cases are "he said, she said" in that the only evidence is the statement of those involved. If there were no witnesses or video, the investigator does not have much to work with.

Notwithstanding these difficulties, Ms. Keith provided evidence that TCF's treatment of sexual-misconduct complaints was significantly less effective than at other facilities. Specifically, the Audit Report indicates that the majority of investigations at TCF—60.8%—ended with a conclusion that the claims were "unsubstantiated." In contrast, the comparison facilities found claims "unsubstantiated" in only 11.1% and 23.1% of their respective investigations. These numbers could be interpreted as reflecting a mere inability to resolve complaints that are inherently difficult to prove. And, if that were the only reasonable inference to be drawn from the evidence, we might conclude Warden Koerner had satisfied his obligation to "tak[e] reasonable measures to insure the safety of inmates." *Lopez*, 172 F.3d at 759. But Ms. Keith provided additional evidence that supports at least a reasonable inference that the high number of "unsubstantiated" claims at TCF may be explained by TCF's investigation practices.

Warden Koerner explained that an allegation would be deemed unsubstantiated if an inmate alleged misconduct but the officer denied the allegations and passed a polygraph test, or where there was no other evidence of the officer's wrongdoing. In other words, "[a]n allegation is unsubstantiated when there is no evidence of guilt but no

17

way of disproving it." Ms. Keith, however, presented evidence that, in *every* he-said-she-said situation at TCF, officials accepted the employee's word over the inmate's without further question or investigation. Indeed, Lieutenant Willie Tabor confirmed that while he worked as an investigating officer at TCF, if a female inmate made an allegation of misconduct and an employee denied it, all such allegations were deemed unsubstantiated.[3]

In describing this evidence, we recognize that prison officials cannot always determine what has happened when an inmate alleges sexual misconduct. We are not suggesting that a warden must act as if each prisoner complaint is true. And we are not suggesting that when a staff member denies the accusation, the warden must take the side of the prisoner. But serious allegations must be investigated, not rejected simply because they are denied. Unfortunately, there may be very little to investigate; the only evidence may be the statements of the prisoner and the staff member. A polygraph test may be a helpful tool (if not to confirm or reject a statement, at least to encourage truthfulness); but if polygraph-examiner opinions are not allowed in disciplinary proceedings, imposition of sanctions may be foreclosed. That does not mean, of course, that nothing can be done. A series of accusations against the same staff member can be sufficiently compelling to override the most vehement denials. Or prophylactic measures may be introduced. If

_____

[3] Kansas Secretary of Corrections Roger Werholz confirmed "when you balance a staff member's word versus an inmate's word, deference is often given or is expected to be given to staff over inmates." But this statement of general practice does not overcome the specific evidence that TCF universally accepted the officer's word, even where the circumstances raised serious questions about the officer's denial.

accusations are sufficiently common, they may warrant installing cameras to keep track of behavior within the prison. And rules can prohibit conduct that provides an opportunity for serious infractions. If, for example, a staff member admits that he was alone with an inmate in a closed storage room but denies assaulting her, the staff member could be disciplined for exercising bad judgment in being alone with an inmate in such a setting and, as in this case, the warden could prohibit staff members from being alone with an inmate.

Our task is to determine whether the warden's response to an accusation is a reasonable one or, instead, shows deliberate indifference to whether serious misconduct is occurring. And even if the initial response was adequate, we must consider whether later experience demonstrated the need for further action. In short, we must avoid generalizing about responses to prisoner allegations. Although statistical information provides some general insight, the reasonableness of the response can only be evaluated in the context of the specific facts surrounding each allegation.

Here, in addition to the statistical information discussed above, the record on summary judgment includes evidence of specific instances where TCF officials failed to fully investigate claims of sexual misconduct.[4] Specifically, we rely on testimony from Warden Koerner, Lt. Tabor, and Chief of Security Joseph Essman, about these incidents.

---

[4] To establish the specific details of individual cases of misconduct, Ms. Keith relies on a Sexual Assault Information Report (SAI Report) which lists and describes the sexual complaints made at TCF. At summary judgment, Warden Koerner argued the report "contain[ed] multiple levels of inadmissible hearsay" because it is a "printout of an Excel spreadsheet . . . created by Legislative Post Audit staff from information received from 'Bob Harrison at KDOC.'" Although the district court stated Ms. Keith "failed to

For example, in July 2006, an inmate alleged she and Officer Bradley Templeton engaged in oral sex and intercourse. She passed a polygraph and he refused to take one. As a result, the investigation was closed as unsubstantiated. When asked why this incident was designated unsubstantiated despite the polygraph results, Lt. Tabor testified "[t]here was no evidence" because he did not consider the inmate's passing of a polygraph as evidence that would warrant further investigation. A couple of weeks later, Officer Templeton again faced allegations that he had engaged in a sexual relationship with a different inmate. This time a polygraph was scheduled for Officer Templeton, but he resigned and did not take it. After the incidents with Officer Templeton, TCF ceased administering polygraphs to inmates, allegedly based on concerns about deterring reports of misconduct.

It is true that Officer Templeton resigned without taking a polygraph with respect to either incident and denied the inmates' allegations. Nevertheless, the facts raise a reasonable inference that full investigation of the first complaint may have resulted in meaningful discipline and prevented further incidents involving Officer Templeton. A reasonable fact finder could also infer that sexual misconduct generally would not be

adduce any *admissible* evidence that any prison employee continued working at TCF during [Warden] Koerner's time as warden after a claim of sexual misconduct was substantiated," the district court did not explicitly reach a conclusion on the admissibility of the SAI Report in particular. We need not decide the admissibility of the SAI Report here because several witnesses testified about particular incidents reflected in the report, and neither party has challenged the admissibility of such testimony. We therefore discuss only those incidents supported by witness testimony in the record.

effectively deterred where an officer's unsubstantiated denial is accepted without further inquiry over a prisoner's polygraph-supported allegations.

Ms. Keith also presented evidence of an earlier incident in March 2005, when an inmate alleged Officer Jared Bohn touched her vagina and kissed her. Officer Bohn denied the allegations but failed a polygraph. No further investigation followed and the incident was listed as unsubstantiated. Nevertheless, Officer Bohn received a five-day suspension for his involvement in the incident. He was later terminated after developing a personal relationship with another inmate. This evidence is particularly troubling as it shows a failure by Warden Koerner to adequately investigate the allegations or to discipline Officer Bohn despite a failed polygraph.

This evidence presented at summary judgment supports an inference that even when a claim of sexual misconduct was supported by corroborating evidence, Warden Koerner failed to impose meaningful discipline. Warden Koerner testified about his general disciplinary practices and explained that, for cases of undue familiarity, subordinate supervisors had authority to handle discipline informally, and he generally was not aware of such actions. In situations involving substantiated allegations of sexual misconduct, Warden Koerner generally terminated the employee but may have suspended, counseled, or reprimanded the employee depending on the circumstances. But under the circumstances involving Officer Bohn—a failed polygraph—his five-day suspension evidences Warden Koerner's failure to implement and enforce policies that may have prevented the sexual assault by Mr. Gallardo.

Although there is no evidence that an employee continued working at TCF after a *substantiated* incident of sexual misconduct, the Audit Report concluded TCF "was more inconsistent and lenient in response to staff misconduct situations, especially in cases of undue familiarity." To support this statement, the Audit Report identifies the following examples: one employee received a letter of reprimand for hugging an inmate, while another was merely counseled when found in an office alone with an inmate with the door closed and the lights out. In a different instance, the warden recommended dismissal when an employee gave a former inmate a bike, but the Civil Service Board amended the dismissal to a suspension, "citing inconsistent disciplinary measures and specifically . . . cases where employees' actions appeared to be much more egregious, yet those employees received less stringent disciplinary action."

And Warden Koerner "reduced punishment for several employees he determined were 'salvageable' or who had shown sufficient remorse." The Audit Report gives three examples: (1) Warden Koerner reduced discipline from termination to a thirty-day suspension for an employee who allegedly accepted responsibility and showed remorse after distributing confidential information about male inmates to the female inmates under that employee's supervision; (2) Warden Koerner imposed a ten-day suspension for an employee who in his third incident of undue familiarity caressed an inmate's ear and hung a sex toy from the ceiling; (3) Warden Koerner amended discipline from termination to demotion and a thirty-day suspension where the employee showed remorse for having an inappropriate relationship. Again, this evidence supports at least an inference that Warden Koerner failed to punish employee misconduct consistently.

22

Although the Constitution does not require a wooden system of punishment that ignores an offender's remorse, his or her track record, or the severity of the offense, looking at the totality of the circumstances at TCF—particularly the lax response to Officer Bohn's failed polygraph in response to allegations of sexual assault—and viewing the evidence in the light most favorable to Ms. Keith, a reasonable jury could infer that Warden Koerner's practices created an atmosphere where employees, particularly maintenance employees, faced minimal supervision and little threat of investigation or discipline for inappropriate sexual behavior with inmates. Although TCF had formal policies prohibiting sexual misconduct, the evidence raises questions about whether those policies were being followed or enforced. Despite facing a higher number of allegations of sexual misconduct and undue familiarity than similar facilities, Warden Koerner's most common response was to deem the allegations unsubstantiated whenever the employee denied them. In turn, even when breach of polices designed to protect inmates from undue familiarity and sexual misconduct was independently corroborated, discipline was lax.

Considering the evidence as a whole, a jury could reasonably infer that Warden Koerner was personally involved in failing to enforce policies in a way that allowed sexual misconduct to occur at TCF. *See Tafoya v. Salazar*, 516 F.3d 912, 920 (10th Cir. 2008) (recognizing several failures by the defendant sheriff but finding "perhaps most troubling" his failure to implement an adequate grievance procedure including "serious investigation and response").

b. *Causation*

The second element of the "affirmative link" between a supervisor and an alleged constitutional deprivation requires proof of causation. "A plaintiff must establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" *Schneider*, 717 F.3d at 768 (quoting *Dodds*, 614 F.3d at 1195–96). Warden Koerner maintains Ms. Keith cannot prove causation because she caused her own injury—specifically, "[Ms.] Keith would not have been put in a situation to be taken advantage of by [Mr.] Gallardo if she had not agreed to remove herself from the standard protections of the other officers, inmates, and security cameras and seclude herself with someone she knew or should have known to be a criminal." We find no basis for this argument, either in the facts or the applicable law.

First, Warden Koerner provides no support for the assertion that Ms. Keith should have known Mr. Gallardo would assault her. Even if Ms. Keith consented to the initial sexual encounter with Mr. Gallardo, Warden Koerner does not dispute Ms. Keith's version of events or her allegations that she did not consent to intercourse with Mr. Gallardo. In the summary judgment proceedings before the district court, Warden Koerner argued he could not be liable because Ms. Keith consented to the encounter with Mr. Gallardo, but the district court rejected this argument because it found evidence that "present[ed] a triable issue of fact about consent." But on appeal, Warden Koerner does not reassert his consent argument. Accordingly, we find no basis for the implication that

24

Ms. Keith somehow caused the sexual assault by Mr. Gallardo by agreeing to some sexual activity.

Moreover, we have held that a supervising official's management actions may be sufficient to establish causation. In *Tafoya*, the defendant-sheriff argued that, even if his management decisions established his personal involvement in the constitutional violation, those decisions did not proximately cause his subordinate officer to sexually assault the plaintiff. 516 F.3d at 922. We disagreed, concluding that "acts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault." *Id.*

As explained above, a jury question exists as to whether Warden Koerner was personally involved in the violation of Ms. Keith's rights based on his responses to sexual misconduct and his other management practices. With respect to causation, the Audit Report stated, "[F]acility officials should have recognized certain red flags and acted on them. Doing so likely would have prevented the incidents from occurring." Under *Tafoya*, the jury should be permitted to consider whether Warden Koerner's practices created an atmosphere that proximately caused Ms. Keith's injury.

c. *State of mind*

Finally, to establish the third prong of the constitutional-violation analysis—culpable state of mind—a § 1983 plaintiff alleging an Eighth Amendment violation must prove that the defendant acted with deliberate indifference. *Id.* at 916. "The standard is subjective, requiring that the official actually be 'aware of facts from which the inference

25

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To satisfy this standard, the plaintiff must produce "evidence showing that the defendant knowingly created a substantial risk of constitutional injury." *Schneider*, 717 F.3d at 769 (internal quotation marks omitted). Inaction, in certain instances, can be enough—"a local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Id.* at 769 (citation omitted). But "even if a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk." *Tafoya*, 516 F.3d at 916. In identifying the relevant risk, we do not focus on the risk to a specific inmate by a specific employee; we instead analyze whether the combined circumstances created a risk for inmates in the plaintiff's situation. *See Farmer*, 511 U.S. at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.").

In *Gonzales v. Martinez*, where two corrections officers sexually assaulted the plaintiff-inmates, we concluded there was sufficient evidence of deliberate indifference by the sheriff because it could be "fairly inferred" that his "purported ignorance of the dangerous conditions in the jail was a direct result of his lackadaisical attitude toward his responsibility to run the institution." 403 F.3d at 1187. Specifically, the evidence showed

26

the sheriff's investigating officer did not want to investigate claims, the sheriff consistently ignored complaints because he discredited inmates' allegations, and the sheriff left the two plaintiffs under the supervision of the very men who had assaulted them in the first place. *Id.* In addition, the sheriff knew of a "documented lapse of security" and knew about complaints of sexual harassment and intimidation throughout the jail. *Id.* We concluded these facts raised a reasonable inference that the sheriff disregarded an excessive risk to the plaintiffs. *Id.*

The same sheriff was again sued in *Tafoya*, but even after facing suit in *Gonzales*, the sheriff "made only minimal efforts to address the glaring safety problems at the jail." *See Tafoya*, 516 F.3d at 918. His efforts included a "no-contact" policy, installation of new surveillance cameras, hiring additional female staff, and providing a half-day training regarding sexual contact between staff and inmates. *Id.* But the evidence also showed the sheriff made no effort to alter his "lackadaisical" managerial style; he did not impose serious threats of discipline for policy violations; he enforced the no-contact policy only infrequently; he continued to employ officers with known criminal records; and he eliminated the jail's grievance system because there were "too many complaints." *Id.* at 918–21. We explained that even with policies in place to respond to misconduct, such policies may be "empty gesture[s] without corresponding supervision and a legitimate threat of discipline for infractions." *Id.* at 919. We therefore concluded "[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." *Id.*

Based on the evidence presented thus far, Warden Koerner's failure to act is less egregious than the sheriff's lackadaisical behavior in *Gonzales* and *Tafoya*. Nevertheless, Ms. Keith has presented sufficient evidence to create a jury question about whether Warden Koerner failed to take reasonable steps to alleviate known risks within TCF. It is undisputed that Warden Koerner implemented policies to address undue familiarity and sexual misconduct, but as in *Tafoya*, there is at least a reasonable inference that there was no corresponding supervision or meaningful threat of discipline. Although Warden Koerner expressed concern about the ongoing problems with undue familiarity and sexual misconduct, he did not credit inmates' testimony when they raised allegations against an employee. Rather, he presumptively accepted his employees' word and designated most claims as unsubstantiated. Indeed, Ms. Keith presented evidence that he endorsed a policy that weighed employee testimony more favorably than an inmate's, even when the employee refused to take a polygraph and the inmate's polygraph results corroborated her allegations. And when Officer Bohn failed a polygraph administered in the face of allegations of sexual misconduct, there was no further investigation and the punishment imposed was a mere five-day suspension.

Viewing this evidence together with the high volume of complaints at TCF, the multiple complaints against individual employees, and the lackluster response to such complaints, we conclude Ms. Keith has demonstrated a genuine issue of material fact about whether Warden Koerner acted with deliberate indifference to the risk of sexual misconduct by his employees. *Cf. Hovater*, 1 F.3d at 1064, 1068 (holding sheriff was entitled to qualified immunity where he had no knowledge that officer was a threat to

28

female inmates in part because "no female inmate had complained of sexual misconduct by [the officer in question] or any other detention officer"). At trial, Warden Koerner may introduce evidence to rebut any inference of knowledge or to show his actions were reasonable under the circumstances, *Farmer*, 511 U.S. at 844, but the weighing of such evidence is the jury's role, not ours, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In summary, Ms. Keith has presented sufficient evidence to establish Warden Koerner's personal involvement, causation, and state of mind, as necessary to present her constitutional violation to a jury. Viewing the circumstances at TCF as a whole, there is sufficient evidence from which a reasonable jury could infer that Warden Koerner was aware of but failed to address a substantial risk that his employees would engage in sexual misconduct and thereby harm TCF inmates, including Ms. Keith.

## 2. Clearly Established Law

In addition to establishing a constitutional violation by Warden Koerner, Ms. Keith also had the burden at summary judgment to show that her constitutional right was clearly established. *Thomson*, 584 F.3d at 1312. As we stated in our previous decision in this case, "it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment." *Keith v. Koerner* (*Keith I*), 707 F.3d 1185, 1188 (10th Cir. 2013). We have further concluded "an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards," and "a prison official's failure to protect an inmate from a known harm may constitute a constitutional violation." *Hovater*, 1 F.3d at 1068. In other words, "prison

officials . . . must 'take reasonable measures to guarantee the safety of inmates.'"

*Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). And we have held that such "reasonable measures" include "serious investigation and response" when a prison official becomes aware of a risk to inmates, including sexual misconduct by prison employees. *See Tafoya*, 516 F.3d at 920. Thus, at the time of the constitutional violation in October 2007, it was clearly established that Ms. Keith not only had a right to be free from attack by Mr. Gallardo, she also had a constitutional right to expect reasonable protection from TCF officials such as Warden Koerner and a reasonable response when sexual misconduct occurred.

And Ms. Keith presented sufficient evidence that these clearly established rights were violated. She presented evidence of inappropriate behavior by Mr. Gallardo, systemic problems within the maintenance program, and misconduct throughout the facility. To be sure, the misconduct fell along a broad spectrum, ranging from undue familiarity to confirmed sexual assault. But we must consider the totality of the circumstances, including all instances of employee misconduct. Moreover, we must consider the evidence of limited investigation and lax discipline for both undue familiarity and sexual misconduct, evidence which supports an inference that a culture existed where TCF employees faced no real consequences for misconduct. Importantly, the evidence includes the inadequate investigation of the sexual misconduct allegations against Officers Bohn and Templeton, and the slack discipline imposed on Officer Bohn.

In other words, viewing the evidence as a whole, a reasonable jury could conclude that Warden Koerner created an atmosphere where policies were honored only in the

breach, and, as a result, he failed to take reasonable measures to ensure inmates were safe from the risk of sexual misconduct by TCF employees. Because Ms. Keith possessed a clearly established constitutional right and presented evidence of a constitutional violation by Warden Koerner, summary judgment was inappropriate on qualified-immunity grounds.

## B.  *Statute of Limitations*

As an alternative basis to affirm, Warden Koerner asserts that Ms. Keith filed her claim outside the statute of limitations and failed to establish the applicability of the statutory tolling provision. The district court denied Warden Koerner's motion for summary judgment on this basis. We review this order de novo. *Howard v. Waide*, 534 F.3d 1227, 1235 (10th Cir. 2008).

"No statute of limitations is expressly provided for civil rights claims brought under section 1983." *Garcia v. Wilson*, 731 F.2d 640, 642 (10th Cir. 1984). Accordingly, we look to state law to determine the applicable limitations period. *Id.* In doing so, we have held "that every section 1983 claim is in essence an action for injury to personal rights" and therefore apply the statute of limitations for personal injury actions in the state where the claim accrued. *Id.* at 651; *see also Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1493 (10th Cir. 1991) ("[W]e held in *Garcia* . . . that every claim under 42 U.S.C. § 1983 is a claim for injury to personal rights governed by the relevant statute of limitations for the state in which the claim accrued." (internal quotation marks omitted)). Applying this rule here, the statute of limitations for Ms. Keith's claim is two years. Kan. Stat. Ann. § 60-513(a)(4); *see also Cameron v. Stotts*, 43 F.3d 1482, at *1 (10th Cir.

1994) (unpublished) ("The two-year statute of limitations for injuries to the rights of others, Kan. Stat. Ann. 60-513(a)(4), applies to civil rights actions brought pursuant to section 1983.").

Ms. Keith's cause of action arose on October 2, 2007, the date of the sexual assault by Mr. Gallardo. But Ms. Keith did not file her complaint until May 17, 2011, three years and seven months after the incident. Ms. Keith does not dispute this timeline. She instead contends the statute of limitations was tolled during the time she was incarcerated at TCF. Under Kan. Stat. Ann. § 60-515(a), a person "imprisoned for a term less than such person's natural life" is entitled to bring an action within one year after being released from custody. Ms. Keith was released from TCF on May 18, 2010, and filed her complaint within the year, on May 17, 2011. She therefore maintains she timely filed her complaint.

But section 60-515(a) does not apply to an incarcerated person who "has access to the court for purposes of bringing an action." *See also Parker v. Bruce*, 109 F. App'x 317, 319 (10th Cir. 2004) (unpublished) ("[T]he Kansas legislature has expressly instructed that any inmate who *has* access to the court is not entitled to any tolling of the limitation period."). Accordingly, we are left with the question of whether Ms. Keith had access to the court such that the tolling provision did not apply to save her claim.

Warden Koerner relies on the following undisputed facts to argue that Ms. Keith had the requisite access: (1) in January and September 2007, before her encounter with Mr. Gallardo, Ms. Keith filed two motions in the Kansas state court criminal case that led to her incarceration at TCF; (2) in 2008, Ms. Keith filed a motion in a case related to

32

custody of her son; (3) in 2009, Ms. Keith filed motions and was represented by a public defender in two criminal cases filed concurrently in Kansas and Missouri; (4) Ms. Keith attended court proceedings at least twice while incarcerated at TCF; and (5) Ms. Keith had access to a law library at TCF.

We agree with the district court "that a reasonable jury might find these facts persuasive" and might agree with Warden Koerner's position. And, as a matter of law, if this evidence were considered in isolation, it may have established sufficient access to the courts. *See, e.g.*, *Cameron*, 43 F.3d at *1 ("Mr. Cameron contends that his claim for alleged constitutional violations . . . is not time-barred because the statute of limitations is tolled pursuant to section 60-515(a). He argues that administrative segregation denies him access to the courts. We are not persuaded. The very filing of this claim undermines his argument."); *Williams v. Olathe, Kan. Police Dep't*, 945 F.2d 412, at *2 (10th Cir. 1991) (unpublished) (holding plaintiff had access to the court as of the date he filed a complaint in an unrelated case while incarcerated); *Ventris v. Kansas*, No. 11-3013-SAC, 2012 WL 4933324, at *7 (D. Kan. Oct. 16, 2012) (unpublished) (holding that tolling provision did not apply where plaintiff had access to a law library and filed documents, thus "illustrating his access to the courts"); *Brown v. Gray*, No. 06-3003-JTM, 2011 WL 1097766, at *4 (D. Kan. Mar. 22, 2011) ("Plaintiff was able to file suit to bring this action and he has filed several other motions and documents during the course of this litigation. His ability to file suit and to file pleadings with this court dooms his legal disability argument.").

33

But Ms. Keith presented additional evidence that creates a genuine dispute of material fact about her ability to access the courts. In particular, when TCF began its internal investigation, the investigator had Ms. Keith sign a Confidentiality Agreement in which she agreed "not to discuss or divulge any information" provided in the investigation against Mr. Gallardo. The Confidentiality Agreement further provided that "a breach of confidentiality can result in disciplinary action." Ms. Keith "was under the impression that [she] would be bound by this form as long as [she] was incarcerated" and that during her incarceration she would be "in trouble for speaking about [the assault by Mr. Gallardo]." She also described the fear she felt at TCF, related to potential disciplinary action or other retaliation if she discussed the assault.

Warden Koerner maintains the significance of the Confidentiality Agreement is undermined by Ms. Keith's participation in court proceedings as outlined above, and by her other conduct while incarcerated at TCF. Specifically, in August 2009, Ms. Keith met with an attorney who requested a meeting and brought a reporter with him, whom the attorney identified as a legal assistant. Ms. Keith discussed the sexual assault with these two men. Ms. Keith also told her father about the assault when he visited her at TCF. Then, in October 2009, Ms. Keith filed a formal grievance with KDOC related to the assault by Mr. Gallardo. Warden Koerner maintains these facts belie Ms. Keith's position that the Confidentiality Agreement restricted her from disclosing the sexual assault, and with these facts, no reasonable jury could conclude Ms. Keith lacked access to the court. While we agree that these facts may prove problematic for Ms. Keith and may damage her credibility, "[c]redibility determinations, the weighing of the evidence, and the

34

drawing of legitimate inferences from the facts are jury functions, not those of a judge" when "ruling on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.*

Applying this standard here, we find it significant that Ms. Keith signed the Confidentiality Agreement in which she contractually agreed not to speak about the sexual assault by Mr. Gallardo. Warden Koerner has not presented evidence that anyone at TCF rescinded the Confidentiality Agreement in a way that allowed Ms. Keith to freely file a § 1983 claim while incarcerated at TCF. Moreover, Ms. Keith provided testimony explaining that she subjectively feared retaliation from inmates and TCF administration if she were to file a claim. Viewing these facts in the light most favorable to Ms. Keith, there is a triable issue about whether Ms. Keith lacked access to the courts and therefore, a triable issue as to whether her claim is barred by the statute of limitations.

## III. CONCLUSION

For the above reasons, we REVERSE the grant of summary judgment in favor of Warden Koerner on qualified immunity grounds and AFFIRM the denial of summary judgment on the statute of limitations. We therefore REMAND for further proceedings consistent with this decision.