FILED
United States Court of Appeals
Tenth Circuit

February 5, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LADONA A. POORE,

     Plaintiff - Appellee,

v.

STANLEY GLANZ, in his individual
capacity; VIC REGALADO, in his official
capacity,[*]

     Defendants - Appellants.

No. 16-5164
(D.C. No. 4:11-CV-00797-JED-TLW)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[**]
_____

Before **TYMKOVICH**, Chief Judge, **BALDOCK** and **LUCERO**, Circuit Judges.
_____

In 2010, detention officer Seth Bowers sexually abused then-seventeen-year-old Ladona Poore while she was incarcerated at the David L. Moss Criminal Justice Center in Tulsa, Oklahoma. Poore brought Eighth Amendment claims under 42 U.S.C. § 1983 against the Tulsa County sheriff, Stanley Glanz, in his individual and

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Vic Regalado, the current Tulsa County sheriff, is automatically substituted for former Tulsa County sheriff Michelle Robinette as an appellant.

[**] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

official capacities,[1] alleging that the jail provided inadequate housing, staffing, and supervision for the area of the facility where juvenile female inmates were housed. Following trial, the jury returned a verdict in favor of Poore, awarding $25,000 in damages. The district court denied a post-verdict motion for judgment as a matter of law ("JMOL") or a new trial.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Viewed in the light most favorable to Poore, the evidence shows that Glanz knew the policies he implemented with respect to juvenile female inmates created an excessive risk of sexual assault and that he was deliberately indifferent to that risk. Although Glanz acknowledged that juvenile female inmates were at a heightened risk of sexual abuse, he chose to house them in an area of the jail that was visually isolated, unmonitored, and often staffed by only one male officer, and where a prior incident of misconduct had occurred. He did so despite written policies intended to prevent sexual abuse that required direct supervision of juvenile inmates and prohibited male officers from entering the cell of juvenile female inmates alone. We conclude that the evidence is sufficient to support the jury's conclusions that Glanz caused a violation of Poore's constitutional rights and that he acted with a sufficiently culpable state of mind. We further conclude that the contours of the constitutional right at issue were sufficiently

---

[1] After Michelle Robinette replaced Glanz as acting Tulsa County sheriff, she took his place as the defendant with respect to Poore's official capacity claim pursuant to Fed. R. Civ. P. 25(d). As noted in the caption, Robinette was subsequently replaced by Vic Regalado.

clear that Glanz is not entitled to qualified immunity. We reject a number of other evidentiary arguments advanced on appeal.

# I

## A

We review a district court's denial of JMOL de novo, drawing all reasonable inferences in favor of the non-moving party. Hardeman v. City of Albuquerque, 377 F.3d 1106, 1112 (10th Cir. 2004). In conducting this review, we cannot "weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for th[ose] of the jury." Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 549 (10th Cir. 1999) (quotation omitted). "[W]e may find error only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found." Ralston Dev. Corp. v. United States, 937 F.2d 510, 512 (10th Cir. 1991) (quotation omitted). "We review for abuse of discretion a district court's denial of a motion for a new trial under Rule 59(a)." M.D. Mark, Inc. v. Kerr-McGee Corp., 565 F.3d 753, 762 (10th Cir. 2009) (citation omitted). If "a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1284 (10th Cir. 1999) (quotation omitted).

In contrast to the deferential standard we apply in reviewing a jury's verdict, we review a district court's doctrinal analysis regarding qualified immunity de novo. Maestas v. Lujan, 351 F.3d 1001, 1007 (10th Cir. 2003). If a defendant asserts qualified immunity, "the plaintiff has the heavy burden of establishing: (1) that the

3

defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions." Greene v. Barrett, 174 F.3d 1136, 1142 (10th Cir. 1999).

The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including "reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quotation omitted). However, this minimum standard does not impose constitutional liability on prison officials for every injury an inmate suffers during detention. First, the alleged injury must be "sufficiently serious." Id. at 834 (quotation omitted). It is undisputed that sexual assault satisfies this objective component of an Eighth Amendment claim. See Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993) ("[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards.").

Second, the prison official must have had "a sufficiently culpable state of mind" amounting to "deliberate indifference." Farmer, 511 U.S. at 834 (quotation omitted). Under this standard, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." Id. at 837. The official must actually be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to

4

perceive it, is not an infliction of punishment and therefore not a constitutional violation." Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008).

This mens rea standard extends to Eighth Amendment claims brought against supervisors. To prevail on a supervisory liability claim, there must be an "affirmative link between the constitutional deprivation and the supervisor's actions." Keith v. Koerner, 707 F.3d 1185, 1188 (10th Cir. 2013) ("Keith I"). A supervisor is directly responsible for an Eighth Amendment violation if the plaintiff can show: "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010). Similarly, because we have recognized that "[s]uing individual defendants in their official capacities under § 1983 . . . is essentially another way of pleading an action against the county or municipality they represent," Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010) (citations omitted), an official capacity claim can only be established if the official's own policies led to the deprivation of the plaintiff's constitutional rights. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." (italics omitted)).

**B**

With this framework in mind, we turn to the evidence presented at trial. Poore was housed at the Tulsa County jail from January to April of 2010. During that time period, she occupied one of the few cells in the north wing of the jail's medical unit.

The cell was located near a nurses' station, but curtains obscured the view from the nurses' station to the door to Poore's cell. The area had no surveillance cameras.

Poore testified that during the early portion of her detention, Bowers began groping her. She stated that he entered her cell and engaged in this type of misconduct more than fifty times. The sexual abuse escalated during the course of her incarceration. Bowers watched Poore in the shower, asking if she was done and then laughing at her. He later exposed himself to Poore and demanded oral sex. Bowers engaged in oral sex with her on approximately ten occasions, and sexual intercourse approximately five times. Poore did not inform jail staff of the abuse because Bowers convinced her they would both face consequences if she reported him.

After Poore was released, jail officials received a report about possible misconduct by Bowers. A material witness who had also been housed in the north wing informed an investigator, Billy Joe McKelvey, that Bowers would enter Poore's cell and stay anywhere from five to twenty minutes at a time. The witness also informed McKelvey that another officer knew about these "inappropriate relations." McKelvey met with the officer, who conceded he was aware of the misconduct and agreed to write a report. However, McKelvey explained that he had to engage the officer "pretty bluntly because he did not want to provide me this information."

During McKelvey's investigation, two other detention officers reluctantly admitted they heard from an inmate that "an employee of the sheriff's office was having relations with the females on the . . . north end of the medical unit." The

6

inmate explained that Bowers entered the cells of juvenile female inmates by himself and stayed for approximately twenty minutes. A juvenile female inmate who was housed across from Poore informed McKelvey that Bowers entered both of their cells.

At the time of these events, Glanz was responsible for overseeing operation of the Tulsa County jail. Glanz recognized that rates of sexual abuse are much higher for incarcerated juveniles than for incarcerated adults. He acknowledged that girls are disproportionately represented among sexual abuse victims. And he agreed with Poore's counsel that "youth incarcerated with adults are probably at the highest risk of sexual abuse."

Glanz further agreed that eliminating "blind spots" is key to effective supervision and that it is "critical" that individuals within the jail are aware that their conduct will be monitored or subject to surveillance. He stated that juvenile male inmates are housed in a "direct supervision" unit because very few inmate assaults occur in such settings. Female juvenile inmates, however, were not placed in a direct supervision environment. Glanz conceded that this placement decision violated his own policies. He further admitted that jail policies prohibiting a male officer from entering the cell of a juvenile female alone were instituted to protect those inmates from sexual assault, and that the policy was disregarded.

Glanz also admitted he was aware of a prior incident in which a male nurse had been watching a juvenile female inmate shower in the medical unit. Although he conceded that better monitoring in that unit could discourage future incidents, Glanz

7

had not made any change to the manner in which juvenile female inmates were supervised after this prior incident.

## II

## A

On appeal, defendants argue that Poore's Eighth Amendment claim fails because she merely established a generalized risk of sexual assault rather than identifying any threat Bowers posed to herself. But an "official's knowledge of the risk need not be knowledge of a substantial risk to a _particular_ inmate, or knowledge of the particular manner in which injury might occur." Tafoya, 516 F.3d at 916 (citing Farmer, 511 U.S. at 843). Nor must a defendant be aware of the "specific [individual] who eventually committed the assault . . . and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Farmer, 511 U.S. at 843.

Poore does not argue that all the inmates in the jail faced a general risk of sexual assault. Instead, she contends that Glanz was deliberately indifferent to a specific subset of individuals incarcerated in the jail: juvenile female inmates housed in the north wing of the medical unit—a small, clearly defined group. At the time of the incidents at issue, there were two or three such inmates. At most, six juvenile female inmates were present at any one time during Glanz's tenure. Poore presented evidence showing that Glanz was subjectively aware that these inmates were at a high risk of sexual assault and that conditions in the north wing were especially

8

dangerous. The jury permissibly inferred that he was aware of the specific risk faced by Poore and other juvenile female inmates housed in the north wing. See generally Farmer, 511 U.S. at 848 (noting that "because of petitioner's youth and feminine appearance," respondents admitted that he was "likely to experience a great deal of sexual pressure in prison" (quotation omitted)).

Defendants further argue that they cannot be liable because no juvenile female inmate housed in the north wing of the medical unit had ever been sexually assaulted prior to Poore. Many of our prior cases in which a supervisor was held liable for sexual misconduct involved prior instances of abuse. See, e.g., Tafoya, 516 F.3d at 915; Gonzales v. Martinez, 403 F.3d 1179, 1182-85 (10th Cir. 2005). But Poore did present evidence of a prior instance of sexual misconduct in the medical unit. Glanz was aware that a male nurse employed by the jail inappropriately watched a fifteen-year-old female inmate while she showered in the medical unit. He also conceded that this type of misconduct could have been discouraged by changes to the jail's monitoring policy for that area. Despite his knowledge of this prior instance of sexual misconduct, Glanz did not make any changes to the manner in which juvenile female inmates were housed or how the medical unit was supervised, staffed, or monitored.

Nevertheless, defendants argue that the shower incident was distinct enough from the events at issue in this case that it could not establish deliberate indifference. This argument ignores the fact that during the course of Bowers' escalating misconduct, he engaged in precisely the same action, watching Poore while she

9

showered. In any event, we reject the suggestion that the only possible prior incident that could have alerted jail officials to the risk Poore faced would be a prior sexual assault of a juvenile female inmate by a detention officer in the north wing of the medical unit. As appellants themselves point out, the population of juvenile female inmates housed in the jail was very small. Defendants thus ask us to reverse a jury verdict based on the notion that, in an exceedingly small sample size, a prior incident must be identical rather than merely similar to the misconduct at issue to demonstrate a sufficiently serious risk. This we cannot do. As we have previously recognized, instances of sexual assault often begin with lesser violations of prison policy and are thus "relevant to the totality of the circumstances at [a prison] that may have contributed to the sexual misconduct." Keith v. Koerner, 843 F.3d 833, 842 (10th Cir. 2016) ("Keith II").

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact . . . ." Farmer, 511 U.S. at 842. We do not suggest that the shower incident, standing alone, would place every reasonable prison official on notice of a substantial risk. Instead, given the evidence presented in this case—including Glanz's admissions of the dangers at issue—we conclude that the jury acted within its discretion when it determined that Glanz was subjectively aware of Poore's risk of sexual assault in the north wing of the medical unit and that his decision to house her there evinced deliberate indifference.

**B**

For similar reasons, we reject the argument that defendants are entitled to qualified immunity because this court has not previously held that the precise combination of policies implemented by Glanz constituted deliberate indifference. We have recognized "it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment." Keith I, 707 F.3d at 1188. And because "a prison official's failure to protect an inmate from a known harm may constitute a constitutional violation," we have further held it to be clearly established that inmates possess "a constitutional right to expect" that jail officials will "reasonabl[y] protect[]" them from such abuse. Keith II, 843 F.3d at 850 (quotation and citation omitted).

Principles regarding supervisory liability in this context are also firmly established. In Dodds, we explained that "the clearly established prong of the qualified immunity inquiry asks whether the contours of the right the plaintiff claims the defendant violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right." 615 F.3d at 1206 (quotations and alteration omitted). We concluded it was "clearly established by 2007 that officials may be held individually liable for policies they promulgate, implement, or maintain that deprive persons of their federally protected rights." Id. at 1207.

We have held corrections supervisors liable for failing to protect inmates from sexual abuse from staff on several occasions. In Keith I, we affirmed the denial of qualified immunity to a warden following sexual misconduct by an officer toward a

11

female inmate who was participating in a vocational training program. 707 F.3d at 1187. We concluded that prior instances of sexual misconduct and undue familiarity along with "structural policy problems" relating to "the vocational training program and the insufficient use of cameras to monitor inmates and staff" suggested that the warden disregarded a substantial risk of such abuse despite being aware of the problem. Id. at 1189. In Tafoya, we concluded that a sheriff was liable for failing to prevent sexual assaults at a jail for several reasons, including: maintaining a staff who "did not report rapes, assaults, and illegal activities"; failing to enforce a "no contact policy . . . because there was not always a female detention officer on duty"; and failing to fully eliminate "blind spots where assaults could, and did, take place" when coupled with knowledge "that having some cameras in the jail was not enough to deter assaults in unmonitored areas." 516 F.3d at 918-19. And in Keith II, we identified, among other factors that put the prison warden on notice, three prior incidents of "undue familiarity" and "opportunities for employees to be outside of other people's eyesight, outside of cameras, inside of rooms with individual inmates" in the area of the facility where the incident occurred. 843 F.3d at 841 (quotation omitted).

Defendants rely heavily on our prior decisions holding that merely placing a female inmate in the custody of a single male guard does not amount to a constitutional violation. See Barney v. Pulsipher, 143 F.3d 1299, 1311 (10th Cir. 1998); Hovater, 1 F.3d at 1066. In those cases, "however, a constitutional violation was not found because the only proof of prison officials' knowledge of a substantial

12

risk of serious harm to a female inmate and failure to protect was predicated on the existence of a per se violation of a written jail policy." Gonzales, 403 F.3d at 1186; see also Keith I, 707 F.3d at 1190 (noting that, in Barney, "the plaintiff presented no evidence of the actual knowledge required for § 1983 liability for deliberate indifference" and that, in Hovater, plaintiff's claim was based on nothing more "than the fact she was a female inmate"). In this case, Poore has identified particular conditions in the north wing of the medical unit and adduced evidence that enabled the jury to find that Glanz was subjectively aware that those conditions constituted an excessive risk. See Keith I, 707 F.3d at 1190 (rejecting reliance on Barney and Hovater if prison official has "actual knowledge" of threat).

In addition, defendants correctly point out that other facts not present in this case supported a finding of deliberate indifference in Keith I, Tafoya, and Keith II.[2] But the qualified immunity analysis is not "a scavenger hunt for prior cases with precisely the same facts"; the relevant inquiry is "whether the law put officials on fair notice that the described conduct was unconstitutional." Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007) (quotations omitted). "We cannot find

---

[2] Defendants place special emphasis on the general lack of discipline at the facilities at issue in these cases, in contrast to a "zero tolerance" policy they contend was indisputably present at the Tulsa County jail. See Farmer, 511 U.S. at 844 (official may be "free from liability" if he "responded reasonably to the risk, even if the harm ultimately was not averted"). But the record does not clearly demonstrate that such a policy was enforced. See Keith II, 843 F.3d at 848 ("[E]ven with policies in place to respond to misconduct, such policies may be empty gestures without corresponding supervision and a legitimate threat of discipline for infractions." (quotation and alteration omitted)). Three officers were aware of the sexual misconduct and failed to report it until confronted during McKelvey's investigation. There is no evidence that these individuals were ever sanctioned.

13

qualified immunity wherever we have a new fact pattern." Id. Although each of the

conditions identified by Poore taken individually would not constitute a clearly

established violation of Poore's Eighth Amendment rights, the confluence of factors

in this case impels us to affirm the district court's denial of qualified immunity. See

Keith II, 843 F.3d at 840 ("[W]e must consider the conditions of confinement as a

whole." (quotation omitted)). A reasonable official in Glanz's position, who had his

subjective knowledge of the dangers posed by conditions in the north wing, would

have been on fair notice that his conduct was unlawful.

## C

We also affirm the district court's denial of JMOL as to Poore's official

capacity claim. Because an official capacity claim "is essentially another way of

pleading an action against the county or municipality [the official] represent[s],"

Porro, 624 F.3d at 1328, we consider whether the Monell factors are satisfied. Under

that test, "a plaintiff asserting a § 1983 claim must show 1) the existence of a

municipal policy or custom and 2) a direct causal link between the policy or custom

and the injury alleged." Mocek v. City of Albuquerque, 813 F.3d 912, 933 (10th Cir.

2015) (quotation omitted).

> A policy or custom may take a variety of forms, including:
>
> (1) a formal regulation or policy statement; (2) an informal custom amounting
> to a widespread practice that, although not authorized by written law or
> express municipal policy, is so permanent and well settled as to constitute a
> custom or usage with the force of law; [or] (3) the decisions of employees with
> final policymaking authority . . . .

14

Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010) (quotations and alteration omitted). For the same reasons we have concluded that the jury permissibly found Glanz liable on Poore's supervisory liability claim, we uphold its verdict on her official capacity claim. A jury could have concluded in light of the evidence presented that the jail's policy as to housing juvenile females directly caused the sexual assaults Poore endured.[3]

**III**

Defendants also raise a number of evidentiary challenges on appeal. A district court's evidentiary rulings are reviewed for abuse of discretion. Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995). To warrant a new trial, evidentiary errors must "affect a party's substantial rights." Tanberg v. Sholtis, 401 F.3d 1151, 1162 (10th Cir. 2005).

First, defendants contend that the district court erred in refusing to permit Bowers to testify live, as opposed to by deposition, at trial. It is uncontested that at the time of his deposition, and at the time of trial, Bowers resided in Illinois, much farther than one hundred miles from the district court in Oklahoma. As a result, he was "unavailable" to testify at trial. See Fed. R. Civ. P. 32(a)(4)(B). The pretrial

---

[3] We thus affirm the district court's denial of defendants' motion for JMOL on both the individual and official capacity claims. For the same reasons, we affirm the denial of defendants' motion for a new trial to the extent that it is grounded on insufficiency of the evidence. See Lompe v. Sundridge Partners, LLC, 818 F.3d 1041, 1062 (10th Cir. 2016) ("[a]s with the JMOL standard, the trial court must view the evidence in the light most favorable to the prevailing party" when evaluating a motion for a new trial); Miller v. Eby Realty Grp. LLC, 396 F.3d 1105, 1110 (10th Cir. 2005) (affirming district court's denial of motion for JMOL or in the alternative for a new trial where the "same three issues" were raised).

15

order listed Bowers as a witness by deposition. However, shortly before trial, defendants sought to call him live, apparently to withdraw his prior invocations of the Fifth Amendment during the deposition. The district court reasonably concluded that such conduct would be unfairly prejudicial. See Sec. & Exch. Comm'n v. Graystone Nash, Inc., 25 F.3d 187, 190-91 (3rd Cir.1994) (noting that "because the [Fifth Amendment] privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent" and thus "belated waiver of the privilege could be unfair").

Second, defendants object to the district court's admission of evidence regarding Bowers' prior criminal history. A witness' prior bad acts are generally inadmissible. See Fed. R. Evid. 608(b). However, "[a]dmission of rebuttal evidence, particularly when the defendant 'opens the door' to the subject matter, is within the sound discretion of the district court." United States v. Troutman, 814 F.2d 1428, 1450 (10th Cir. 1987). During opening statement, counsel for the defendants stated that Bowers had "not even a speeding ticket in his life." We rule that the district court did not abuse its discretion in permitting admission of evidence regarding Bowers' criminal history.

Third, defendants assert that the district court erred in permitting Poore's counsel to question an expert witness about another alleged sexual assault of a female inmate in the jail's medical unit. During cross-examination, defense counsel asked questions about that witness' deposition testimony in a case arising from the incident. On re-direct, Poore's counsel elicited additional testimony regarding the other case.

16

Because the district court issued a curative instruction to the jury to disregard this evidence, we hold that even were it erroneously admitted, defendants' substantive rights were not violated as a result. See United States v. Morgan, 748 F.3d 1024, 1042 (10th Cir. 2014) (holding that "juries are presumed to follow curative instructions" to disregard evidence).

Fourth, defendants argue that the district court erred in denying their motion to permit the jury to view the jail's medical unit. "Whether the jury is permitted to view evidence outside the courtroom is a matter for the discretion of the trial court." United States v. Culpepper, 834 F.2d 879, 883 (10th Cir. 1987). At trial, the jury saw photographs of the medical unit and heard evidence concerning the structure of this portion of the jail. And by the time trial commenced, the medical unit had changed significantly from the time when Poore was incarcerated.[4] We conclude that the district court did not abuse its discretion in denying this request.

Finally, defendants argue that the trial court erroneously excluded evidence of the crimes Poore committed. They suggest that admission of this evidence was necessary because Poore's counsel cross-examined Glanz and Robinette on the jail's policies regarding youthful offenders. By not allowing counsel to explain Poore's status as an adult offender, defendants contend the district court prejudiced them.

---

[4] Ironically, defendants moved to exclude as an improper subsequent remedial measure under Fed. R. Evid. 407 evidence that cameras had been added to the jail since Poore's release, which the trial court granted. A jury view thus would have presumably prejudiced the defendants by revealing to the jury the addition of cameras.

17

We are not persuaded. Weighing against this limited probative value was the danger of unfair prejudice to Poore. See United States v. Moore, 401 F.3d 1220, 1223 (10th Cir. 2005) (noting "the introduction of evidence" of an individual's "prior crimes risks significant prejudice") (quotation omitted). We rule that the district court did not abuse its discretion in weighing the competing factors and excluding this evidence.[5]

## IV

**AFFIRMED**.

Entered for the Court


Carlos F. Lucero
Circuit Judge

---

[5] Defendants also contend that if we reverse on the merits, we must vacate the district court's cost award. Because we reject defendants' arguments on the merits, there are no grounds for us to do so.

18